**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

DEBORAH MERRITT,

       *Plaintiff-Appellant,*

v.

OLD DOMINION FREIGHT LINE, INC.,

       *Defendant-Appellee.*

No. 09-1498

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

       *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, District Judge.
(6:07-cv-00027-nkm-mfu)

Argued: January 27, 2010

Decided: April 9, 2010

Before WILKINSON, DUNCAN, and DAVIS,
Circuit Judges.

Reversed and remanded by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Davis joined. Judge Davis wrote a concurring opinion.

**COUNSEL**

**ARGUED**: Valerie Ann Chastain, VALERIE A. CHASTAIN, PC, Bedford, Virginia, for Appellant. Julie Loraine Gantz, U.S. EQUAL EMPLOYMENT OPPORTU-NITY COMMISSION, Washington, D.C., for Amicus Supporting Appellant. Robert Craig Wood, MCGUIREWOODS, LLP, Charlottesville, Virginia, for Appellee. **ON BRIEF:** James L. Lee, Deputy General Counsel, Lorraine C. Davis, Acting Associate General Counsel, Vincent J. Blackwood, Assistant General Counsel, U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Washington, D.C., for Amicus Supporting Appellant. Aaron J. Longo, MCGUIRE-WOODS, LLP, Charlottesville, Virginia, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Plaintiff-appellant Deborah Merritt was a truck driver employed by defendant-appellee Old Dominion Freight Line, Inc. ("Old Dominion"). After being fired from her job, Merritt sued Old Dominion in the United States District Court for the Western District of Virginia, alleging sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Merritt asserted that Old Dominion fired her due to a discriminatory belief that women were incapable of performing the duties of her position. In its defense, Old Dominion claimed that it discharged Merritt instead because she had failed a physical ability test following an ankle injury. The district court granted summary judgment in favor of Old Dominion, determining that Merritt had produced insufficient evidence to demonstrate that Old Dominion's legitimate and non-discriminatory reason for her termination was "pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Under the particular circumstances

here, we think Merritt has presented an issue of triable fact, and we must accordingly reverse.

## I.

We review the facts under the traditional summary judgment standard, giving the benefit of inferences to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-55 (1986). The defendant, Old Dominion, is a nationwide trucking company that employs thousands of drivers, including both "Line Haul" drivers and "Pickup and Delivery" drivers. Line Haul drivers often drive long distances across state lines, spending some nights and weekends away from home. Pickup and Delivery drivers, on the other hand, work more locally and rarely work nights and weekends. Also, because Pickup and Delivery drivers pick-up and unload freight, the job requires more lifting and is physically more demanding than that of a Line Haul driver. Of Old Dominion's workforce of approximately 3100 Pickup and Delivery drivers, about six are female.

Deborah Merritt's story is one of a certain grit and perseverance. For six years, she was employed by Old Dominion as a Line Haul driver at its Greensboro, North Carolina and Waynesboro, Virginia terminals. During her time as a Line Haul driver, Merritt often made lengthy cross-country trips, to places like California and Texas, and sometimes logged more than five hundred miles per day. She performed her duties without incident or complaint. Eventually, Merritt became interested in becoming a Pickup and Delivery driver so she could work more regular hours and spend her nights and weekends at home. To show Old Dominion that she could perform the job successfully, she filled in numerous times as a Pickup and Delivery driver in May 2002. When filling in, she likewise performed the duties without incident or complaint. In fact, the record reflects that Merritt's supervisor found her work as a Pickup and Delivery driver to be fully

satisfactory and even received compliments from clients about it.

Shortly thereafter, a permanent Pickup and Delivery position became available at Old Dominion's Lynchburg, Virginia terminal. Merritt expressed her interest in the position to Bobby Howard, the Lynchburg terminal manager. Howard informed Merritt that he lacked the authority to fill the position, but that was untrue. In fact, Howard later filled the position with a male, who had less truck-driving experience than Merritt and who had not previously worked for Old Dominion. Merritt continued to fill in temporarily as a Pickup and Delivery driver during the rest of 2002.

In May 2003, another permanent Pickup and Delivery position became available in Lynchburg, and Merritt again expressed her interest in it to Howard. Yet again, Merritt was passed over in favor of a less-experienced male driver. When Merritt asked why she was not hired to fill the positions, Howard told her that "it had been discussed and it was decided that they could not let a woman have that position." Howard also reminded her that "the company did not really have women drivers in the city [as Pickup and Delivery drivers]." On another occasion, Howard told Merritt that Lemuel Clayton, Old Dominion's Regional Vice President, was worried about hiring a female Pickup and Delivery driver and "was afraid [a female] would get hurt." On still another occasion, Howard told Merritt that Clayton had concerns about her being a Pickup and Delivery driver because he "didn't think a girl should have that position." Clayton, however, denies the allegations.

Finally, in March 2004, Old Dominion hired Merritt to fill a permanent Pickup and Delivery position in the Lynchburg terminal. Before making the decision to do so, however, Howard allegedly asked two male Pickup and Delivery drivers how they would feel working with a woman, and they responded they would not have a problem with it. After Mer-

ritt was hired, she was placed on a ninety-day probationary period, during which she stood to lose the job if any performance problems arose. According to Merritt, this probationary period was unusual, since no male drivers were subject to anything similar, while according to Clayton, the probationary period was a standard opportunity afforded to all transferring employees to allow them to change their minds about the transfer. In any event, it is uncontradicted that although Merritt's duties and pay were those of a Pickup and Delivery driver, her official job classification was never changed from Line Haul to Pickup and Delivery driver.

From March 2004 to September 2004, Merritt performed her Pickup and Delivery duties, by all accounts satisfactorily. She never had a problem lifting freight or performing the same duties that male Pickup and Delivery drivers performed, and she never received any complaints about her work from management, coworkers, or customers. Despite her positive record with the company, Steve Godsey, the then Operations' Manager for the Lynchburg terminal, told a male Pickup and Delivery driver that he "d[idn't] see why they brought [Merritt] here in the first place. This is not a woman's place."

Then, on September 29, 2004, Merritt suffered an ankle injury while moving boxes on the job. When Brian Stoddard, the Vice President of Safety and Personnel at Old Dominion, learned of Merritt's injury, he put her in touch with a workers' compensation representative and several human resources employees. Merritt's doctor, Dr. Jay Hopkins, examined Merritt and diagnosed her with "plantar fasciitis with a superimposed strain." Dr. Hopkins put Merritt on light-duty work until her next appointment with him on December 27, 2004. Around that same time, Merritt began expressing an interest in returning to her normal duties, since her ankle was healing well and she was not having any serious or lingering problems with it.

Before Merritt's December 27 doctor appointment, Stoddard decided to require Merritt to take a fitness test to assess

her ability to perform her Pickup and Delivery duties. Accordingly, on December 22, 2004, Old Dominion booked an appointment for a physical ability test ("PAT") for Merritt to take on December 28, 2004. The PAT is a full-body test, divided into six separate components, that evaluates the test taker's general strength, agility, and cardiovascular endurance. It is graded on a pass/fail basis. To pass, an employee must perform various tasks roughly designed to mimic those required of Line Haul and Pickup and Delivery drivers. The PAT was created for Old Dominion by an independent company in 2001 "to be used in the hiring process." Consistent with this purpose, Old Dominion uses the PAT primarily in the pre-employment context to evaluate potential hires, but, as Stoddard himself testified, only on a "very variable" basis.

On December 27, Merritt met with Dr. Hopkins. During that visit, Dr. Hopkins examined Merritt's foot and ankle, noting that "her foot [wa]s feeling fine," that the injury was not a "disabling condition," and that Merritt seemed "to be on the right track." Dr. Hopkins concluded that "[t]he good news is that she has had a good response to treatment and I would have every reason to think that this will do fine." As Dr. Hopkins later testified, "there was nothing about Ms. Merritt's medical condition which would have prevented her from performing her job duties as a Pickup and Delivery driver for Old Dominion as of December 27, 2004." Despite a clean bill of health, Dr. Hopkins followed his standard practice and released Merritt back to work on a "trial basis," since he "cannot give the patient's employer a one hundred percent guarantee."

The day after seeing her doctor, Merritt took the PAT, as scheduled. Merritt struggled with several segments of the PAT and received an overall failing grade. According to Merritt, the tasks with which she had problems were unrelated to her ankle injury. For example, on one portion of the PAT, Merritt was unable to place a box of weights on an overhead shelf simply because the shelf was too high for her (at barely

over five feet, one inch tall) to reach. On another part of the PAT, Merritt had difficulty walking backward pulling a cable due to people bumping into her in a crowded hallway.

After receiving the results of Merritt's PAT, Stoddard decided to terminate Merritt's employment with Old Dominion. It is undisputed that Stoddard alone made the decision to fire Merritt. Stoddard was also the sole decision maker responsible for requiring Merritt to take the PAT. In fact, as Vice President of Safety and Personnel "throughout the entire company," Stoddard handled all "question[s] about the physical capability of a driver to perform safely." On February 1, 2005, Merritt's employment was officially terminated, with the reason documented on her paperwork as "inability to perform job." To replace Merritt, Old Dominion hired male Pickup and Delivery drivers in the Lynchburg terminal.

In August 2005, Merritt filed a charge of sex discrimination against Old Dominion with the Equal Employment Opportunity Commission. Upon issuance of a right-to-sue notice, Merritt then filed this action in the district court for the Western District of Virginia. She alleged that Old Dominion's termination of her employment constituted unlawful discrimination under Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e *et seq.* In response, Old Dominion claimed that it had fired Merritt, not because she was a woman, but because she failed the PAT.

Following cross-motions for summary judgment, the district court granted Old Dominion's motion for summary judgment and denied Merritt's. The district court assumed, without deciding, that Merritt had demonstrated a prima facie case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The district court also found that Old Dominion had satisfied its burden of production under *McDonnell Douglas* to articulate a legitimate, non-discriminatory reason for Merritt's discharge: "that she failed the PAT, which indicated that

she did not have the requisite physical strength to safely perform her job duties."

The district court, however, determined that Merritt had failed to carry her ultimate burden of persuasion under *McDonnell Douglas*. Specifically, the court found that Merritt had "failed to prove that [Old Dominion's reason for firing her] was a pretext for discrimination, because she has not produced any evidence that Brian Stoddard, the Old Dominion employee responsible for Merritt's discharge, harbored any discriminatory animus." According to the district court, Merritt's "limited circumstantial evidence" simply "[wa]s not sufficient to create a genuine issue of material fact on whether Merritt's failure of the PAT was a pretext for discrimination." Merritt now appeals.

## II.

Title VII makes it unlawful for an employer to discriminate against an individual on the basis of sex. *See* 42 U.S.C. § 2000e-2(a)(1). As one method of establishing a successful Title VII case, a plaintiff may proceed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its progeny. *See, e.g.*, *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277 (4th Cir. 2004) (en banc). Pursuant to this framework, a plaintiff first must make out a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action. *Id.* at 253. Finally, if the employer carries this burden, the plaintiff then has an opportunity to prove by a preponderance of the evidence that the neutral reasons offered by the employer "were not its true reasons, but were a pretext for discrimination." *Id.* The final pretext inquiry "merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional

discrimination," which at all times remains with the plaintiff. *Id.* at 256.

Notwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of "the ultimate question of discrimination *vel non*." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983). As the Supreme Court has explained, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). Thus, "[c]ourts must . . . resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination of 'the ultimate question of discrimination *vel non*.'" *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) (citation omitted).

By the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination, and "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993); *see also Reeves*, 530 U.S. at 142-43 (discussing the reduced relevance of burden-shifting paradigm once the employer has met its burden of production); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 n.10 (1981) (same). As the Supreme Court has made clear, "courts should [not] treat discrimination differently from other ultimate questions of fact." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983). Under this rubric, summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

III.

With these principles in place, we turn to the matter at hand. Here Old Dominion proffers a legitimate, non-discriminatory justification for discharging Merritt: her failure of the PAT, "which indicated that she did not have the requisite physical strength to safely perform her job duties." Merritt not surprisingly insists that this asserted rationale was really a "pretext for discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). We think the record as a whole supports Merritt's claim that a jury could find that discrimination on the basis of gender was afoot.

A.

To begin, Merritt has introduced ample evidence showing that Old Dominion's proferred explanation for the discharge —Merritt's failure on the PAT—was "unworthy of credence." *Burdine*, 450 U.S. at 256. Two considerations compel this conclusion. *First*, the record indicates that Merritt's ankle injury was temporary and had healed at the time of her termination. Merritt's physician, Dr. Hopkins, testified that as of December 27, 2004—one day before the PAT—Merritt's ankle was fully healed and "doing as well, if not better, . . . than before her injury." Hopkins also noted that the injury was not a disabling condition. The district court likewise found that "Merritt's injury was temporary" and that "there was no indication that the injury would prevent her from resuming her full duties once it healed." Based on her speedy recovery and sunny prognosis, Merritt felt ready and able to return to work as soon as possible and expressed her willingness to do so to Old Dominion. Indeed, as Dr. Hopkins stated, "there was nothing about Ms. Merritt's medical condition which would have prevented her from performing her job duties as a Pickup and Delivery driver for Old Dominion as of December 27, 2004."[1]

---

[1]Although Dr. Hopkins released Merritt only on a "trial basis," that notation, according to Dr. Hopkins, was not indicative of any real limita-

Yet Old Dominion did not allow Merritt to return to work. It did not even leave open the possibility that she could return to work at a later date, for example by providing additional time for recovery or by waiting for Merritt's next doctor visit to resolve ongoing concerns about the injury's effect on job performance. Instead, Old Dominion deemed it necessary to order a full-blown fitness test to assess the effects of an injury that was neither severe nor long-lasting and then used the results of that PAT to claim Merritt was physically unable to perform the job she had been physically performing for months prior to her minor injury. In doing so, Old Dominion terminated a good employee who, pre-injury, performed her job ably and without complaint and who, post-injury, was both willing and able to report to this same job for work. These facts, if believed, would allow a trier of fact to think Old Dominion was simply looking for a reason to get rid of Merritt.

*Second*, Old Dominion's proferred rationale is undermined by the undisputed fact that the PAT was a general, full-body physical fitness test not designed to test any body part in particular. Some of the six segments of the PAT tested overall strength and agility and some tested cardiovascular endurance, but none directly evaluated Merritt's ankle. Only one component of the test, on which Merritt did well, even arguably gave Old Dominion any information regarding the condition of her ankle. According to an expert on trucking industry standards, Old Dominion's use of the PAT on Merritt was atypical, both because the PAT "was not specific to [Merritt's] foot sprain," and because he was "unaware of a single

---

tions on Merritt's abilities to return to work but rather part of his standard practice, based on his reluctance as a medical professional to fully guarantee complete recovery. As Dr. Hopkins further testified, if an employer indicates that the "trial basis" release is problematic and prevents the employer from allowing the employee back to work, he will rewrite it without the notation. Here, Old Dominion never afforded Dr. Hopkins, or Merritt, such an opportunity.

instance where any motor carrier had either established a policy for or had tested injured employees on portions of their bodies which were not affected by an injury." Unsurprisingly then, Merritt's difficulties with the PAT appeared to have nothing at all to do with her ankle. She struggled with the "step test" portion, for example, because she was too short to reach the overhead shelf.

In light of evidence that the PAT was not even designed to test Merritt's alleged physical shortcoming, a jury could find that Old Dominion's contention—that Merritt's minor and temporary injury necessitated her passing the PAT—is specious. Especially in combination with Merritt's other evidence, these alleged facts suggest that perhaps Old Dominion's neutral reason "w[as] not its true reason[], but w[as] a pretext for discrimination." *Id.* at 253.

### B.

In this case, Merritt provided evidence not simply of falsity but of discriminatory intent as well. Specifically, Merritt set forth evidence that: (1) Old Dominion used the PAT selectively, excusing injured male employees from taking it; and (2) The employee responsible for requiring the PAT and firing her, Stoddard, harbored discriminatory animus toward women insofar as he was responsible for selectively employing the PAT and was part and parcel of Old Dominion's widespread resistance to hiring women as Pickup and Delivery drivers. Based on this evidence, Merritt claims a fact finder could find in favor of her on the ultimate question of intentional discrimination.

In arguing otherwise, Old Dominion contends that summary judgment is nonetheless warranted, because it has countered Merritt's evidence of discriminatory motive with evidence so compelling that "no rational factfinder could conclude that [its termination of Merritt] was discriminatory." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,

148 (2000). It maintains that, contrary to Merritt's assertions, the evidence compels the conclusions that: (1) Old Dominion used the PAT consistently, pursuant to a prudent and neutral company policy; and (2) Stoddard was himself blameless and exhibited no discriminatory motive. We shall review those contentions in turn.

1.

Old Dominion argues that its decision to terminate Merritt was made pursuant to a uniform and neutrally administered company policy. Under its alleged policy, any employee, regardless of gender, must take and pass a PAT if that employee missed work due to an injury and received anything less than a complete and unequivocal medical authorization to return to full duties. Stated differently, a PAT is automatically required whenever an injured employee receives an ambiguous or conditional release from a physician (i.e., a release on a "trial basis" or with "light duty" restrictions). According to Old Dominion, the policy is intended to mitigate the potentially dire consequences of sending injured employees back to work before they are physically ready. Because the PAT is triggered by the language of the doctor's note, a gender-neutral criterion, Old Dominion argues that its policy conclusively negates a discriminatory intent.

We begin by acknowledging that if indeed Old Dominion had such a policy and faithfully abided by it, that fact would, as Old Dominion suggests, be a neutral and legitimate business practice. Old Dominion has understandable safety concerns, especially since its employees are responsible for driving large trucks and carrying heavy freight. A policy of the sort Old Dominion claims to have is sensible, because it helps prevent an injured employee from further aggravating an injury, thereby jeopardizing eventual recovery; ensure that an injured employee's job performance is not so impaired as to endanger public safety, diminish employee morale, or generate customer complaints; and limit Old Dominion's poten-

tial workers' compensation claims and tort liability. Moreover, it is not our task to say what policies a company should or should not adopt, if the policies it does adopt are gender neutral. *See Hawkins v. Pepsico, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir. 1992).

The problem with the policy lies not in theory but in practice. Here, Merritt has advanced evidence suggesting that the policy does not exist or, alternatively, that it was erratically implemented. Three considerations inform our conclusion. First, the policy's existence is drawn into question by the conspicuous lack of evidence in the record concerning it. As both parties agree, the policy has never been memorialized in writing. And while an informal policy is no less a policy, it is curious that no one at the company seemed to be familiar with even an informal policy. Of eight Old Dominion employees asked about the matter, all eight denied ever having heard of the policy. In fact, Stoddard himself—the individual responsible for deciding whether and when to order PATs and thus presumably charged with administering the policy—suggested that Old Dominion did not have an official policy regarding whether and when to order PATs. Rather, he explained that if an employee could not perform job duties because of pain due to an injury, he's "not necessarily going to send them for a [physical fitness] test."

Second, the policy's existence is dubious due to its delayed emergence in the course of this litigation. Early on, Old Dominion did not assert a firm policy on when PATs were ordered, claiming instead that the test was given on an "as needed basis." Likewise, although Old Dominion noted that it was "its policy and practice [] not to return a driver to the road following an injury unless that driver has a complete, unrestricted medical clearance," it expressly emphasized Stoddard's discretion, stating that "[w]hen there is a question about the physical capability of a driver to perform safely," Stoddard "must make a decision, based on the facts and cir-

cumstances presented, about what to do." In making those decisions, "the varying circumstances must be taken into account, and each medical report must be handled on a case-by-case basis." Even before the district court, Old Dominion did not allege a clear policy, leading the district court to find that, "Old Dominion admitted that the PAT is given in 'varying circumstances' on a case-by-case basis" and "without a clear policy on when it is to be used."

It was only late in the game, on appeal and perhaps not until oral argument before this court, that the policy really took shape. At that point, Old Dominion began to pivot, arguing that PATs were not required after all on a discretionary, case-by-case basis but each and every time, without exception, an injured employee was issued an ambiguous medical release. But "a factfinder could infer from the late appearance of [the employer's] current justification that it is a post-hoc rationale," "invented for the purposes of litigation," and "not a legitimate explanation for [its] decision." *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001).

Third, apart from the paucity of evidence of the policy's existence and the policy's late-blooming appearance, Merritt has set forth evidence that Old Dominion did not faithfully adhere to the policy and instead ordered PATs on an uneven basis. As a general matter, Old Dominion used the PAT rarely, even as to pre-hires, whom the PAT was designed to evaluate. In fact, Old Dominion required a paltry four percent of its Pickup and Delivery drivers to ever take the PAT. Especially as to injured employees, the test was administered inconsistently. Although several injured employees received ambiguous medical releases, there is limited evidence in the record as to whether Old Dominion implemented the policy to require them to take and pass PATs as a condition of returning to work. Only two individuals at Old Dominion recalled an injured employee taking a physical test, and they could not remember whether the test was a PAT or some other test.

At least two injured employees exempted from the policy's reach were males, and their circumstances were similar to Merritt's own. Like Merritt, these male drivers missed work as a result of an injury and received a conditional release from a physician. Unlike Merritt, both men were allowed to return to their full duties without passing a PAT. Importantly, in both cases, Stoddard presumably was the decision maker who opted against a PAT.[2]

Gerald Dalton, for instance, had a hernia operation, which caused him to miss six months of work—about twice the time Merritt missed. Although his doctor only gave him permission to return to "light duty" work,[3] Stoddard nonetheless returned him to full duties without a PAT. Additionally, when Donald Smith missed work due to a shoulder injury, he was issued a physician's note that was, by Old Dominion's own admission, "not . . . definitive enough." Yet Smith was not required to take a PAT and instead required only to take a functional capacity evaluation (FCE). In contrast to the full-body PAT, the FCE was tailored to his injury, testing the mobility and strength of his shoulder.

In addition to the differential treatment of male comparators, Old Dominion failed to follow its purported policy even

---

[2]Stoddard testified that he has served as Vice President of Safety and Personnel "throughout the entire company" for the past eleven or twelve years, and, as Old Dominion admitted in its responses to interrogatories, Stoddard was therefore responsible for making all decisions regarding "question[s] about the physical capability of a driver to perform safely." When asked whether he is "consulted or informed whenever an Old Dominion employee is going to have to take [a physical fitness] test," Stoddard replied, "I'm the one that makes that decision, so, yeah, I'm informed. Actually I inform other people."

[3]In disputing this evidence, Old Dominion points to a physician's note in the record that released Dalton "to regular work w/ splint." That release, however, relates not to Dalton's hernia operation but to a separate thumb injury. Dalton unambiguously testified that after his hernia operation, he was subject to "light duty" restrictions.

with regard to Merritt herself. Admittedly, the conditions necessary to trigger a PAT under the purported policy were present: Merritt was an injured employee who missed work due to her injury and received a "trial basis" release from her doctor. However, these conditions were not met at the time Old Dominion decided to require Merritt's PAT. Rather, Old Dominion scheduled Merritt's PAT five days *before* she received a "trial basis" release. Viewing the evidence in Merritt's favor, Old Dominion's decision to have Merritt take and pass the PAT cannot be explained by the policy at all.

To be sure, Old Dominion claims it scheduled the PAT because it knew, based on conversations with Merritt's doctor, that Merritt was going to receive a "trial basis" release. That view, however, was thrown into question by evidence that Merritt's doctor had never communicated with anyone at Old Dominion concerning his intent to release Merritt on a "trial basis," whereupon Old Dominion clarified that it knew Merritt *might* receive a "trial basis" release and wanted to schedule the PAT just in case. These variously unsupported, belated, and shifting rationales for requiring the PAT and hence discharging Merritt have passed the point of pretext. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 n.7 (4th Cir. 2007). While a neutral policy serving Old Dominion's legitimate business interests in public and employee safety could certainly be put in place, a trier of fact could reasonably find that Old Dominion's selective application and ever-changing rationales for the PAT were designed to conceal an intent to reserve the plum Pickup and Delivery positions for male drivers only.

### 2.

Old Dominion next argues that whatever the sentiments about women at the company generally, Merritt has failed to prove that Stoddard himself harbored discriminatory animus against women. A plaintiff does not need a "smoking gun" to prove invidious intent, and few plaintiffs will have one.

Rather, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation and internal quotations omitted). This is not to say that thin cases should go to trial. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Rather, factual disputes must be both material and genuine, and district courts must ensure both conditions are satisfied before sending a case to trial. *Id.* at 248; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). We think, however, that Merritt has met the standard.

By utilizing the PAT to assess the physical qualifications of Merritt but not males similarly situated to her, Stoddard could be seen by a jury to embrace beliefs that women are unsuited for some of the more remunerative forms of manual labor and, once injured, are less resilient in their ability to recover. To be sure, certain jobs do require attributes of strength and endurance, and an employer is plainly entitled to assure itself, through testing or otherwise, that employees can actually perform the work for which they are hired. *See* 29 C.F.R. § 1607.1 *et seq*. But this justification is not available to Stoddard or to Old Dominion, because Merritt had not only been performing her Pickup and Delivery duties for months before her injury, but performing them very well. At least these proceedings have revealed no blemish on her record, and Old Dominion does not to this day contend Merritt did not pass muster. Even were a jury to conclude that Stoddard reacted to Merritt's ankle injury out of an allegedly benevolent view that women were more fragile and thus more profoundly affected by injuries than their male counterparts, that would fail to square with Title VII's mandate, which is to displace perceptions based on race, ethnicity, and gender with perceptions based on such non-discriminatory criteria as capabilities and qualifications. *See Griggs v. Duke Power Co.*, 401 U.S. 424,

436 (1971) ("Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant."). In short, a reasonable fact finder could look askance at Stoddard's selective use of the PAT, requiring Merritt to take the test and exempting men who, like Smith and Dalton, suffered arguably more debilitating physical setbacks and missed more work.

We must of course be cautious about attributing to any ultimate decision maker such as Stoddard the most unfortunate expressions and beliefs of those around him and those who worked in his employ. *See Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004) (en banc). It is regrettable that any distasteful comments will arise in the workplace, but that cannot mean that the actual decision maker is impugned thereby. It is the decision maker's intent that remains crucial, and in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced. *See McCarthy v. Kemper Life Ins. Cos.*, 924 F.2d 683, 686-87 (7th Cir. 1991). But that nexus existed here. It is not unfair to observe that the corporate culture evinced a very specific yet pervasive aversion to the idea of female Pickup and Delivery drivers. Old Dominion employees, of all ranks, seemed to share a view that women were unfit for that position. A regional vice president remarked, for instance, that he "didn't think a girl should have that [Pickup and Delivery] position." He also worried that women were more injury-prone, explaining that he did not want to hire a female Pickup and Delivery driver because he "was afraid [she] would get hurt." An operations' manager stated, "[t]his is not a woman's place." A terminal manager forthrightly acknowledged the company's reluctance to hiring female Pickup and Delivery drivers, noting that "the company did not really have women [Pickup and Delivery] drivers," and that Merritt was passed over because "it was decided that [the company] could not let a woman have that position."

While the views of others are no proof of the views of Stoddard, at some point the corporate environment in which

he worked places Stoddard's own selective use of the PAT in Merritt's case in a less neutral context. In *Lettieri v. Equant, Inc.*, 478 F.3d 640, 649 (4th Cir. 2007), for example, we noted that the plaintiff had put forward the kind of "'evidence that clearly indicates a discriminatory attitude at the workplace and . . . illustrate[s] a nexus between that negative attitude and the employment action.'" *Id.* (quoting *Brinkley v. Harbour Rec. Club*, 180 F.3d 598, 608 (4th Cir. 1999)). We accordingly deemed the plaintiff's "powerful evidence showing a discriminatory attitude at [her company of employment] toward female managers" sufficient to "allow a trier of fact to conclude that these discriminatory attitudes led to [plaintiff's] ultimate termination." *Id.* Likewise here.

Female Pickup and Delivery drivers were rare, with only six identified in a workforce of over 3000 and with Merritt the only female in her terminal. As one Old Dominion driver concisely summarized, "We don't have no females." Merritt's two-year quest to be transferred from Line Haul to Pickup and Delivery is consistent with that general pattern. She was twice passed over in favor of less-experienced males; she was not told the truth about her supervisor's authority to fill the position; and she was told that she was not hired become some were uncomfortable with women having the job and were wary that the enhanced physical requirements of Pickup and Delivery, as compared to Line Haul, were too demanding for women. Even after she was finally hired, she was placed on an allegedly out-of-the-ordinary probationary status and never granted a change in her official job title. The evidence would allow a jury to conclude that Old Dominion never wanted to hire Merritt in the first place and lends credence to the view that it was looking for a reason to fire her.

To be sure, we do not hold that Merritt's evidence *must* be believed or that, if believed, *must* yield an inference that Old Dominion unlawfully discriminated against her. But because Merritt's evidence *may* well be believed and *may* well yield

such an inference, Old Dominion is not entitled to summary judgment.

## IV.

At this point, it is perhaps worthwhile to take a step back. We fully acknowledge that the "elusive factual question of intentional discrimination" is inevitably tough and rarely clear cut. *See Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n.8 (1981). Our holding is not about setting tripwires whenever an employer fails to dot its "i's" or cross its "t's" in following a policy. It is not about taking a fine-toothed comb to the record in the hopes of unearthing some minor discrepancy in an employer's story. And it is certainly not about infusing fear and trembling into a company's every employment decision.

But the alleged facts here are too problematic to overlook. Evidence of a good employee record combines with evidence of an impermissible company attitude to form a lethal concoction. Old Dominion fired an employee who was, according to the district court, "able to do her job without assistance and in a satisfactory manner," due to a treatable ankle injury, while hiding behind the results of a selectively administered physical fitness test that did not even purport to test the injury, and while dubiously claiming that its decision was compelled by a late-blooming policy, all in the context of, to put it mildly, a sexually stereotyped work environment. In this case, it is not any single piece of evidence but rather the evidence taken in its entirety that leads us to believe Merritt deserves a trial. Disposition of Merritt's claim at the summary judgment stage would "intrude on the jury function by substituting our own judgment for that of the finder of fact." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 650 (4th Cir. 2002). At trial, Old Dominion will be free to note the burdens that law and regulation can impose on legitimate business judgment, but Merritt will be free to argue on her record

that opportunity under law must be open to the talents and industry of all.

## V.

Based on all the foregoing reasons, we reverse the district court's grant of summary judgment to Old Dominion and remand for trial on Merritt's Title VII claim.

*REVERSED AND REMANDED*

DAVIS, Circuit Judge, concurring:

I am pleased to join the majority opinion in full and applaud the excellent craftsmanship of my good colleague in authoring the opinion. I particularly appreciate the majority opinion's reminder that, in intentional discrimination cases, we should not examine the trees so minutely that we lose sight of the forest. The ultimate question in this case, as in all intentional discrimination cases, is *not* whether the *McDonnell Douglas* test is satisfied. It is instead, as the majority opinion teaches, whether the plaintiff has generated a genuine dispute of material fact that she is the victim of intentional discrimination, notwithstanding facially plausible reasons offered by the employer for its adverse employment action. The proof scheme is but a useful tool to help identify and resolve that real issue.

Although employment discrimination cases are inherently fact-specific, this case stands for an important premise. Our holding makes it abundantly clear that this court will evaluate the *actual application* of employment tests and practices that employers claim to apply in a neutral manner. *See* 42 U.S.C. § 2000e-2(h) (employment tests are not unlawful as long as they are not "designed, intended or used to discriminate because of race, color, religion, sex or national origin"). We will scrutinize these ostensibly neutral practices with care, particularly those that insulate employers from liability in

workplace environments infused with discriminatory animus. An ultimate decision maker's proclamation that he or she neutrally applied a policy or test or practice simply will not withstand scrutiny under Fed. R. Civ. P. 56 in the face of substantial direct and circumstantial evidence to the contrary, evidence, for example, that the employer makes exceptions to the use of, or that that employer selectively applies, the ostensibly "neutral" device.

The majority opinion cogently reasons to its conclusion that, in this case, "a reasonable fact finder could look askance at Stoddard's selective use of the PAT, requiring Merritt to take the test and exempting men who, like Smith and Dalton, suffered arguably more debilitating physical setbacks and missed more work[,]" Maj. Op. at 19, and that "[t]he evidence would allow a jury to conclude that Old Dominion never wanted to hire Merritt in the first place and lends credence to the view that it was looking for a reason to fire her." *Id.* at 20. I firmly agree. As the majority opinion notes, this case presents "evidence that clearly indicates a discriminatory attitude at the workplace and . . . illustrate[s] a nexus between that negative attitude and the employment action." *Lettieri*, 478 F.3d at 649 (quoting *Harbour Rec. Club*, 180 F.3d at 608).

Moreover, while there are certainly some facts in dispute, there are several evidentiary clusters that rest outside the credibility disputes alluded to by the majority. For example, as the majority opinion recognizes, it is undisputed that Merritt's supervisor found Merritt's work as a Pickup and Delivery driver to be fully satisfactory and that he even received compliments from clients about her work. It is also undisputed that Old Dominion applied the PAT test only on a "very variable" basis and did not apply it primarily to evaluate whether an employee could return to work after a workplace injury. It is undisputed that the PAT test was never intended to test the rehabilitation of Merritt's sprained ankle; instead, it was formulated to serve as a *pre-employment test*. It is undisputed that Merritt was fired because she failed the PAT test. And

lastly, it is undisputed that Old Dominion could only identify six female Pickup and Delivery drivers out of its workforce of 3,000 employees, and that Old Dominion replaced Merritt, one of those six female employees, with a male Pickup and Delivery driver. These undisputed facts are emphatically *material* to the ultimate issue of whether Merritt is the victim of intentional gender discrimination but they could easily escape careful consideration by a busy district court because they do not fit neatly within the *McDonnell Douglas* framework. The majority opinion persuasively demonstrates how a court's analysis of intentional discrimination claims *must* accommodate *probative evidence* of every sort, and I am happy to join it fully.