**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 08-1672**

―――――――――

ALI DARVISHIAN,

                    Plaintiff - Appellant,

          v.

PETE GEREN, Secretary of the Department of the Army,

                    Defendant - Appellee.

―――――――――

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  T. S. Ellis, III, Senior District Judge.  (1:08-cv-00009-TSE-TCB)

―――――――――

Argued:  September 21, 2010        Decided:  December 14, 2010

―――――――――

Before GREGORY and KEENAN, Circuit Judges, and James C. DEVER III, United States District Judge for the Eastern District of North Carolina, sitting by designation.

―――――――――

Affirmed by unpublished opinion.  Judge Keenan wrote the opinion, in which Judge Gregory and Judge Dever joined.

―――――――――

**ARGUED:** Gary M. Gilbert, LAW OFFICES OF GARY M. GILBERT, PC, Silver Spring, Maryland, for Appellant.  Leslie Bonner McClendon, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF:** Thomas J. Gagliardo, Silver Spring, Maryland, for Appellant.  Dana J. Boente, United States Attorney, Alexandria, Virginia, for Appellee.

―――――――――

Unpublished opinions are not binding precedent in this circuit.

KEENAN, Circuit Judge:

Ali Darvishian, a 23-year civil servant of Iranian descent, appeals the district court's entry of summary judgment in favor of his former employer, the Secretary of the Army (Secretary), on claims brought under the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. § 2000e et seq. (2006). Darvishian alleged that the Secretary violated Title VII by removing him from federal employment because he is Iranian and Muslim, and because he filed discrimination claims against his superiors with the Equal Employment Opportunity Commission (EEOC).

The district court dismissed these claims, holding that Darvishian presented insufficient evidence that the Secretary's nondiscriminatory and nonretaliatory reasons for his removal were "pretext for discrimination." See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). The district court also affirmed a final decision of the Merit Systems Protection Board (the Board) upholding Darvishian's removal from federal service.

We review the summary judgment decision on Darvishian's Title VII claims de novo, applying the same standard as the district court. See Fed. R. Civ. P. 56(c); Holland v. Washington Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007). Under that standard, summary judgment is appropriate when "there is no genuine issue as to any material fact." Fed. R. Civ. P.

2

56(c)(2); Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 295 (4th Cir. 2010). Therefore, summary judgment may be granted when there is insufficient evidence for a jury to return a verdict in favor of the nonmoving party. See Holland, 487 F.3d at 213.

In our separate review of the Board's decision, we must affirm the Board unless the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c). Upon our review of the record, we affirm the district court's judgment in both the Title VII action and the court's review of the Board's decision.

I.

We present the facts in the light most favorable to Darvishian, and draw all reasonable inferences in his favor. Holland, 487 F.3d at 213. The record before us shows that before his removal from the federal service on July 7, 2006, Darvishian was a General Engineer at the level of GS-14 working for the Army Contracting Agency (the Agency), Capital District Contracting Center (CDCC). In November 2005, Acting CDCC Director Lieutenant Colonel Craig DeDecker announced an office-

3

wide reorganization intended to streamline CDCC operations. DeDecker sent an email to all CDCC employees providing a broad outline of this plan. He told employees that a new organizational division, Construction and Engineering (C&E), was being created and that William E. Campbell would become "Chief" of the division. The email identified three employees, including Darvishian, who were scheduled to be assigned to C&E.

DeDecker attached to the email an organizational chart. The chart identified both Campbell and Darvishian as GS-14 level employees, and a line extended horizontally across the chart from Campbell's name to Darvishian's name. Underneath Campbell's name, the chart stated, "Chief, Team 1."

One component of this reorganization involved placing all contract specialists on a single floor of the CDCC building. As a consequence, certain employees, including Darvishian, were required to relocate their offices to another space in the building.

DeDecker left his position with the CDCC before the reorganization was completed. However, his successor, Christine Thompson, continued to implement the changes when she became the permanent director of the CDCC in December 2005.

On February 22, 2006, the Deputy Director of the CDCC, Brenda Jackson-Sewell, approached Darvishian in his office to discuss a work-related matter. Darvishian asked her about a

4

"rumor" circulating in the office that Darvishian would have to move from his fixed office space to a cubicle. Jackson-Sewell told Darvishian that this information was "not a rumor."

That same day, Campbell personally directed Darvishian to relocate to a cubicle so that a new division chief could move into his office. Darvishian told Campbell that he would not move, because he did not think that Campbell was "his boss."[1] After he left Darvishian's office, Campbell sent the following email to Darvishian: "As your supervisor[,] it is not required that any additional direction to mine be given. Therefore you are directed to move to the last cubical [sic] in room 204. This move has to [be] completed by [the close of business] 1 March 2006." Campbell sent a carbon copy of this email to Thompson and to Jackson-Sewell.

The following day, February 23, 2006, Darvishian approached Thompson to express his concerns about Campbell's order to move Darvishian's office. The parties dispute the details of this conversation, but it is clear from the record that Thompson confirmed to Darvishian that he needed to vacate his office.

Darvishian later lodged various complaints against DeDecker, Campbell, and Thompson by sending an email, stating a subject of "Discrimination," to the head of the Agency. In the

---

[1] Before this encounter, Campbell spent little or no time supervising Darvishian because, in Campbell's words, "[Darvishian] was a senior civil servant and he knew his job."

5

email, Darvishian expressed his concern that he was being marginalized by his superiors and, under the guise of being ordered to move his office, actually was being pressured to leave the CDCC. Darvishian provided the following examples of his superiors' conduct toward him.

Darvishian explained that Thompson's predecessor had sought Darvishian's advice in planning the layout of cubicles and office spaces. Darvishian stated that Thompson, however, had excluded him from similar planning, and had carried out the office reorganization without consulting him.

Darvishian recounted an incident in November 2005 when DeDecker made certain inappropriate comments about people of Middle Eastern descent. Darvishian recalled that DeDecker bragged that he would be able to kill Muslims during his upcoming deployment to Iraq. During the same encounter, Darvishian alleged, DeDecker asked, "Why [are you] all radical Muslims[?]" Darvishian also accused DeDecker of threatening Darvishian that if he "wasn't gone" before DeDecker left the CDCC, Jackson-Sewell and Bill Campbell would "finish[] the job" for him.[2] Finally, Darvishian alleged that DeDecker improperly had promoted a friend to a GS-14 level position.

---

[2] Darvishian also described "rumors" that confirmed his suspicion that he was being pressured to leave the CDCC. According to these "rumors," Darvishian was being ordered from

Darvishian next accused Campbell of improprieties in awarding Army contracts. Darvishian complained that even though Campbell was not his superior, Jackson-Sewell and Thompson had confirmed Campbell's order that Darvishian relocate from his office to a cubicle. Darvishian maintained that Thompson had "backed [Campbell] up" without considering Darvishian's "side of the story."

On receipt of the email, the Director of the Agency for the Northern Region initiated an investigation of Darvishian's allegations. The assigned investigator observed an ambiguity in CDCC hiring procedures, but otherwise concluded that Darvishian's allegations lacked merit. The investigator also concluded that DeDecker's reorganization was "based on sound reasoning with no malicious intent," and that "Darvishian had a responsibility to comply with the lawful orders of his superiors," including DeDecker, Thompson, and Campbell. Based on Darvishian's complaints, the investigator recommended certain changes to internal operating procedures, including that all supervisors should meet with their new employees on the effective date of any reorganization to prevent future "communication gap[s]."

---

his office to "degrade" him and to make him "so unhappy that [he] would want to leave."

7

On March 2, 2006, Campbell went to Darvishian's office purportedly to deliver a memorandum prepared by the human resources department at Thompson's request. The memorandum characterized Darvishian's failure to move from his office by March 1, 2006, as "insubordination," and stated that Campbell was proposing a penalty of suspension for this misconduct. The memorandum set a second deadline, 11:30 a.m. on March 3, 2006, by which Darvishian was required to vacate his office. The document advised Darvishian that disobeying this order "could result in [his] removal from the federal service."

An army lawyer, Captain Joshua Drewitz, accompanied Campbell to see Darvishian but stopped a short distance down the hallway from Darvishian's office. Drewitz could see Campbell in the office doorway, but did not hear the conversation taking place between Campbell and Darvishian. Drewitz did not observe Campbell carrying any papers.

That evening, Darvishian sent an email to senior officials in the Agency describing his exchange with Campbell. Darvishian stated that when Campbell entered Darvishian's office doorway, Campbell held up a piece of paper that threatened, "Get out or you will be killed."[3]

---

[3] In the same email, Darvishian stated, "I don't believe I mentioned it in my initial email but when I had a discussion with Ms. Thompson on 23 Feb, prior to my contact with EEO, she

The next morning, Darvishian reported this alleged threat to the military police. He also sent an email detailing the threat to the "head" employees of the Agency and to an EEO Counselor. The subject of his email was entitled, "Reprisal." The police conducted an investigation, which included interviews of Campbell, Darvishian, and Drewitz, but concluded there was "insufficient probable cause to believe that Mr. Campbell communicated a threat."

On the afternoon of Friday, March 3, 2006, after the deadline stated in the human resources department memorandum had passed, Thompson directed four employees to remove Darvishian's belongings from his office. These individuals conducted an inventory of the items in Darvishian's office and moved the items to a secure file room. Campbell later sent an email to Darvishian, informing him that he could retrieve his belongings by contacting Campbell to obtain a key to the file room. After receiving this email, Darvishian sent another email to Agency "management" and to an EEO Counselor stating, "Bill Campbell continues to harass me."

On Monday morning, March 6, 2006, Darvishian called the military police to report a "property theft." He later made a sworn statement in which he alleged that $1,000 in cash and some

told me 'You are nothing. I will take care of my contracting people.'"

personal documents were missing. Darvishian stated, "[b]ecause [Campbell] has threatened me and now stolen my belongings I am afraid to go back to the office."

The military police conducted an investigation of the alleged theft. The four employees who had moved Darvishian's property attested that they did not find any money in Darvishian's desk when they made the inventory of his belongings.[4] The military police closed its investigation of the incident on April 13, 2006, because of "insufficient probable cause" that a theft had occurred.

On March 22, 2006, Darvishian filed a formal EEO complaint alleging discrimination against certain CDCC officials, including Campbell, Jackson-Sewell, and Thompson. About five weeks later, on April 28, 2006, Campbell proposed that Darvishian be removed from federal service.

In his written proposal, Campbell articulated four reasons for the recommended punishment: insubordination (two incidents), making false statements, failing to provide candid information to the military police, and disrupting the workplace.

Under the first charge, insubordination, Campbell wrote that Darvishian's refusal to comply with two orders to move from his office, by March 1, 2006, and later by March 3, 2006,

---

[4] A former CDCC Director stated in deposition testimony that she had personal knowledge that Darvishian kept cash in his desk.

10

constituted insubordination. Campbell based the second charge, making false statements, on Darvishian's report to the military police that Campbell had threatened Darvishian's life. The proposal of removal characterized this report as "knowingly false."

The third charge, failing to provide candid information to the military police, was based on Darvishian's allegation of theft against Campbell. The notice of proposed removal stated, "At the time you made your allegation against Mr. Campbell to the military police, you failed to tell the military police that you had not personally viewed, seen or otherwise inventoried any personal items you had left in your office since the previous week, or that you had any personal knowledge that Mr. Bill Campbell had removed anything from your office." With regard to the charge of disrupting the workplace, Campbell noted that various CDCC employees were forced to leave their regular work duties to participate in the two police investigations of the charges Darvishian had filed.

Darvishian responded to these charges orally and in writing. Thompson issued a five-page memorandum sustaining the removal charges as supported by the evidence, and Darvishian was removed from federal service on July 7, 2006.

Darvishian timely appealed the Agency's action to the Board, raising discrimination and retaliation as "affirmative

11

defenses." See 5 U.S.C. §§ 7513, 7701. An Administrative Judge upheld the removal in a lengthy written decision, finding that the Agency had proved all four charges by a preponderance of the evidence, and that Darvishian had failed to demonstrate discrimination or retaliation by preponderant evidence.

Darvishian timely filed a petition for review of this initial decision, which a panel of three Board members denied in a Final Order. Darvishian also requested a review by the EEOC, Office of Federal Operations, which issued a decision concurring with the Board. See 29 C.F.R. § 1614.303 et seq.

After receiving the EEOC decision, Darvishian filed the present action in the district court. See 42 U.S.C. § 2000e-16(c) (2006). He alleged that the Agency removed him from federal service as a result of discrimination based on his religion and national origin, in violation of Title VII, and in retaliation for protected EEO activity, also in violation of Title VII. Darvishian additionally sought review of the Board's final decision. The district court granted summary judgment for the Secretary on the Title VII claim, and upheld the Board's decision.

The district court concluded that even if Darvishian could present a prima facie case of discrimination and retaliation, he could not demonstrate that the Agency's proffered reasons for his removal were pretextual, because it was beyond dispute that

12

Darvishian's conduct constituted "insubordination." The district court did not address the other nondiscriminatory bases for removal articulated by the Agency, because the district court found that the removal decision was supported by the insubordination incidents alone, and that Darvishian had not presented sufficient evidence of pretext to overcome the Agency's stated ground of insubordination. Darvishian appeals from the district court's judgment.

## II.

### A.

We first consider the district court's award of summary judgment in favor of the Secretary on the Title VII claims. Under Title VII, it is unlawful for an employer to discriminate against any individual on the basis of religion or national origin. 42 U.S.C. § 2000e-2(a)(1) (2006). It is also unlawful for an employer to retaliate against an employee for participating in a Title VII investigation or for opposing discriminatory workplace practices. Id. § 2000e-3(a).

A plaintiff alleging discrimination under Title VII may avert a summary judgment ruling in favor of an employer by presenting either of two theories of proof. First, a plaintiff may offer direct and circumstantial evidence of discrimination that raises a genuine issue of material fact regarding whether

13

an impermissible factor motivated the employer's adverse employment decision. See Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 318 (4th Cir. 2005). Second, when a plaintiff lacks direct evidence of discrimination or retaliation, he or she may proceed using the burden-shifting proof scheme set forth in McDonnell Douglas Corp. v. Green, 41 U.S. 792, 802-05 (1973).

The present case has proceeded under the McDonnell Douglas analysis. Under that framework, a plaintiff first must establish a prima facie case of discrimination or retaliation. See Burdine, 450 U.S. at 252-53. After the plaintiff has met this evidentiary burden, the burden of production shifts to the employer to set forth, through the introduction of admissible evidence, a legitimate nondiscriminatory or nonretaliatory basis for the employment action. Id. at 253; see Bd. of Trustees v. Sweeney, 439 U.S. 24, 25 n.2 (1978).

If the employer satisfies this burden of production, the plaintiff must establish by a preponderance of the evidence that the neutral reasons offered by the employer are merely pretext for discrimination or retaliation. See Burdine, 450 U.S. at 253. A plaintiff may prove such pretext by demonstrating that the defendant's explanation is "unworthy of credence" or by offering circumstantial evidence sufficiently probative of the issue of discrimination or retaliation. See Reeves v. Sanderson

14

Plumbing Prods., Inc., 530 U.S. 133, 148 (2000); Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004); EEOC v. Sears Roebuck & Co., 243 F.3d 846, 853-54 (4th Cir. 2001).

In practice, the McDonnell Douglas analytical burden shifting ends at this stage, and the "pretext" inquiry merges with the plaintiff's ultimate burden to prove that he or she was the victim of intentional discrimination or retaliation. Burdine, 450 U.S. at 256; see Merritt, 601 F.3d at 294-95. A plaintiff is entitled to a trial on the merits of a Title VII claim if he or she establishes a factual record permitting a reasonable finder of fact to conclude that it is more likely than not that the adverse employment action was the product of discrimination or retaliation. Burdine, 450 U.S. at 254; Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc, 53 F.3d 55, 58 (4th Cir. 1995). Therefore, "[b]y the time of appeal especially, the issue boils down to whether the plaintiff has presented a triable question of intentional discrimination [or retaliation]." Merritt, 601 F.3d at 295.

In considering Darvishian's Title VII claim of discrimination, we assume, without deciding, that Darvishian has established a prima facie case of discrimination. This prima facie case includes the comments allegedly made by Campbell and DeDecker to Darvishian.

15

We conclude that the Agency met its burden to articulate a legitimate, nondiscriminatory basis to remove Darvishian from federal service. As described above, the Agency gave four lawful reasons why Darvishian should be removed, as stated in Thompson's Notice of Decision to Remove. First, Thompson concluded that Darvishian disregarded Campbell's February 22, 2006 email to relocate to a cubicle by March 1, 2006. Thompson further found that Darvishian ignored the March 2, 2006 memorandum, which directed him to move his belongings by 11:30 a.m. on March 3, 2006. Thompson stated that Darvishian had received and disobeyed both orders, and that these acts of noncompliance constituted insubordination.

Second, Thompson determined that Darvishian's accusation that Campbell threatened Darvishian's life was unsupported. Thompson also concluded that Darvishian made this accusation to retaliate against Campbell for ordering Darvishian to move from his office to a cubicle.

Third, Thompson determined that Darvishian gave incomplete information to the police when he reported that Campbell allegedly had stolen some of Darvishian's property. Finally, Thompson determined that as a result of Darvishian's actions, at least five CDCC employees were required temporarily to leave their work duties to participate in police investigations. Thompson summarized Darvishian's conduct as exhibiting a

16

disregard for authority that "deminish[ed] [sic] his supervisor's confidence in being able to continue to task or assign duties to Mr. Darvishian."

To rebut these legitimate reasons for his removal, Darvishian was required to produce a record that would permit a reasonable fact-finder to conclude that the justifications stated by the Agency were merely a pretext for discrimination. See Burdine, 450 U.S. at 253. We conclude that Darvishian has failed to satisfy this burden.

Darvishian argues that the Agency lacked a legitimate basis for removing him from the federal service, rather than for merely suspending him. He relies on the March 2, 2006 memorandum, which indicated that a suspension was the only penalty being considered by the Agency for the first act of insubordination. Darvishian contends that, therefore, Thompson's choice of a more severe penalty was suggestive of pretext.

This argument, however, is unavailing. The record establishes that at least three Agency officials having supervisory authority over Darvishian directed that he vacate his office. Even if we accept Darvishian's argument that he reasonably doubted Campbell's supervisory authority on February 22, 2006, there is no doubt that by February 23, 2006, two other individuals with unquestioned authority over Darvishian had

17

either instructed him to move, or confirmed the legitimacy of Campbell's directive. Thus, regardless whether Darvishian was given the memorandum containing the second deadline of March 3, 2006, his ongoing refusal to move his office constituted insubordination.

We also observe that the penalty imposed by Thompson was consistent with the punishments set forth in the Table of Penalties in the Army regulations. According to that document, a single offense of insubordination or a single incident of making a false statement can be punished by removal. The possibility that a different decision maker may have imposed a less severe penalty if presented with similar circumstances does not support a conclusion that Thompson was motivated by discrimination, or that her stated explanation for removing Darvishian was false.

Nonetheless, we are mindful that the Supreme Court has cautioned that courts should not become mired in the intricacies of the McDonnell Douglas proof scheme. See U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991). Thus, ultimately, we must reverse the district court if it appears that a reasonable fact-finder could conclude that Thompson more likely than not removed Darvishian because of his religion or national origin. Burdine, 450 U.S. at 254.

Darvishian argues that the following evidence of record supports a conclusion that Thompson's employment decision was motivated by discriminatory animus. First, Darvishian points to Thompson's deposition testimony that she feared "Darvishian's irrational behavior." Darvishian infers from this statement that Thompson's apprehension was "based solely on her perception that an Iranian-born man . . . was dangerous." Second, Darvishian heavily relies on an affidavit made by a former CDCC employee, Tracy Fetchik. In her affidavit, Fetchik stated that on March 3, 2006, the day Darvishian's belongings were removed from his office, Thompson drew her finger across her neck as if she were slitting a throat, and stated, "I finally got rid of him." However, while the above evidence cited by Darvishian supports an inference that Thompson disliked Darvishian personally, this evidence does not establish a link between her personal dislike of Darvishian and his membership in a protected class.

Our conclusion does not change when we additionally consider the balance of Fetchik's affidavit. Most particularly, Fetchik stated that "sometimes Ms. Thompson, [another employee,] and Ms. Brenda Jackson-Sewell would make comments amongst themselves about Mr. Darvishian, like he is a crazy Muslim." Notably, however, Fetchik's affidavit fails to identify any particular statement that Thompson made regarding Darvishian's

19

religion or national origin, but only attributes the above type of offensive remark to general group conversation. In the absence of any indication which of the three individuals made a statement of that nature, or any other discriminatory remarks, we are unable to accord such remarks any probative value as tending to establish that Thompson, in fact, was motivated by discrimination regarding Darvishian's religion or national origin in her decision to terminate him from federal service. Absent such probative value, any remarks of this nature were not admissible evidence and, thus, did not create a genuine issue of material fact to avert an award of summary judgment. See Fed. R. Civ. P. 56(e)(1); Fed. R. Evid. 402.

Based on our review of the record, we observe that Thompson apparently developed a dislike of Darvishian. It is also clear that Darvishian perceived that he was being pressured by DeDecker, Campbell, and Thompson to leave the Agency. But Title VII is not "a general civility code for the American workplace." Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)). Rather, Title VII makes unlawful certain, defined intentional acts of discrimination. Darvishian has not demonstrated, as he must to survive summary judgment, that on this record a reasonable fact-finder could conclude that Thompson held discriminatory biases based on Darvishian's

religion and national origin that motivated her decision to remove him from federal service.

We recognize, nevertheless, that under certain circumstances, discriminatory statements by non-decision makers can be attributed to the ultimate decision maker.  See Merritt, 601 F.3d at 300; see, e.g., Hill v. Lockheed Martin Logistics Mgmt., 354 F.3d 277, 289-91 (4th Cir. 2004) (en banc); Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226-27 (5th Cir. 2000); Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997).  Darvishian argues that in this case, Campbell and Thompson merely were carrying out DeDecker's directive to "finish the job" of pressuring Darvishian to leave the CDCC. However, based on the present record, there is no reason to conclude that Thompson based her decision to remove Darvishian on another person's judgment.

The Agency has given a consistent, lawful rationale for its removal of Darvishian, contemporaneously with the disciplinary proceeding and throughout this litigation.  Further, Darvishian has not demonstrated such weaknesses, implausibilities, or inconsistencies in the Agency's proffered reasons for his removal that a reasonable fact-finder could find those reasons "unworthy of credence."  See Price, 380 F.3d at 212; Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  Thus, we conclude that Darvishian has not met his burden to show that a reasonable

21

fact-finder could conclude that the Agency's explanation was pretext for discrimination, or that material factual questions remain regarding the Agency's motives. See Merritt, 601 F.3d at 295. Accordingly, we conclude that on this record, a reasonable fact-finder could not say that Darvishian has presented sufficient facts to show, by a preponderance of the evidence, that discrimination was more likely than not a determinative cause of the Agency's employment decision.

B.

Darvishian also contends that he was removed from his employment in retaliation for complaining about the allegedly discriminatory conduct by his superiors. To establish a prima facie case of retaliation, Darvishian was required to demonstrate that he engaged in "protected activity," and that he was removed by the Agency because of that activity. See Holland, 487 F.3d at 218.

The record shows that when Thompson removed Darvishian from federal service, she knew that he had complained about discrimination at his workplace. Darvishian contends that because his protected activity occurred so close in time to the Agency's removal decision, the simple fact of this temporal proximity establishes a causal connection between the two events.

22

We will assume, but do not decide, that Darvishian has shown a causal connection establishing a prima facie case of retaliation. See Holland, 487 F.3d at 218. Thus, proceeding under the McDonnell Douglas framework, Darvishian was required to rebut the legitimate nonretaliatory reasons articulated by the agency for his removal. Id. Based on our review of the record, we hold that Darvishian failed to make this required showing. We reach this conclusion for the same reasons we already have held that Darvishian failed to demonstrate pretext with respect to his discrimination claims.

### III.

Finally, we consider Darvishian's appeal of the Board's decision. We apply an established, narrow standard of review, under which we must affirm the Board unless, based on the administrative record, the decision is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." 5 U.S.C. § 7703(c) (2006).

In this case, the Administrative Judge determined that the Agency carried its burden to prove by a preponderance of the evidence each charge stated in the notice of removal. The

Administrative Judge also made certain credibility determinations, which are "virtually unreviewable" by this court on appeal. Bieber v. Dept. of the Army, 287 F.3d 1358, 1364 (Fed. Cir. 2002); see Pope v. U.S. Postal Serv., 114 F.3d 1144, 1149 (Fed. Cir. 1997). In assessing testimony related to Darvishian's conduct, the Administrative Judge determined, "[T]he appellant is not a reliable or credible witness in light of his implausible allegations and inconsistent statements." In contrast, the Administrative Judge found that Thompson was a "credible witness."

Applying the deferential standards applicable to our review of the Board's decision, and based on the evidence contained in the administrative record, we hold that the Board conclusions cannot reasonably be said to be arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence. The Board had sufficient evidence before it, and made a reasoned decision based on that record.

For these reasons, we affirm the district court's judgment.

AFFIRMED