**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1568**

———————

CARMEN WANNAMAKER-AMOS,

        Plaintiff – Appellant

    v.

PUREM NOVI, INC., f/k/a Eberspaecher North America, Inc., d/b/a Eberspaecher
Group and Purem by Eberspaecher,

        Defendant – Appellee.

———————

Appeal from the United States District Court for the District of South Carolina at
Greenville. Kevin Frank McDonald, Magistrate Judge. (6:21-cv-02359-KFM)

———————

Argued: May 10, 2024                         Decided: January 13, 2025

———————

Before THACKER, BENJAMIN, and BERNER, Circuit Judges.

———————

Vacated and remanded by published opinion. Judge Berner wrote the opinion, in which
Judge Thacker and Judge Benjamin joined.

———————

**ARGUED:** Brian Patrick Murphy, STEPHENSON & MURPHY, LLC, Greenville, South
Carolina, for Appellant. Melissa Marie Tetreau, BODMAN PLC, Troy, Michigan, for
Appellee. **ON BRIEF:** Rebecca Seguin-Skrabucha, BODMAN PLC, Troy, Michigan, for
Appellee.

———————

BERNER, Circuit Judge:

Carmen Wannamaker-Amos, a Black woman, worked in quality management for more than thirty years, most recently at Purem Novi, Inc.[1] Purem builds exhaust systems for major car manufacturers including Hyundai, BMW, and Daimler. Wannamaker-Amos was well-regarded at Purem. Indeed, she received overwhelmingly positive reviews from her direct supervisors and managers. Only one manager viewed her unfavorably: Javad Hosseini, Purem's chief quality executive.

Wannamaker-Amos claims Hosseini had it out for her. He treated her differently from his other employees—none of whom were Black and nearly all of whom were men. He complained about her job performance and repeatedly urged her supervisors and managers to fire her, although they refused to do so. Finally, in January 2020, several months after Hosseini temporarily assumed the role of Wannamaker-Amos's supervisor, he got his way. Shortly after a problem arose with an automobile part sent to one of Purem's clients, Hosseini sent an email to Purem's human resources office requesting that Wannamaker-Amos be fired. Two days later, Purem terminated Wannamaker-Amos.

Wannamaker-Amos brought suit against Purem alleging she was terminated unlawfully because of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII) and the Civil Rights Act of 1866, 42 U.S.C. § 1981

---

[1] During the relevant time, Purem Novi, Inc. was known as Eberspaecher North America, Inc. We refer to the company as Purem for clarity and consistency.

2

(Section 1981), and her sex, in violation of Title VII.[2] The district court granted summary judgment to Purem, ruling that Wannamaker-Amos failed to produce sufficient evidence that the nondiscriminatory reason Purem gave for firing her was pretextual. After reviewing the evidence in the light most favorable to Wannamaker-Amos, as we must, we conclude that numerous issues of material fact are in dispute. By resolving this case on summary judgment, the district court improperly usurped the role of the jury as the finder of fact. Accordingly, we vacate the district court's grant of summary judgment.

## I. Factual Background[3]

### A. Wannamaker-Amos's Employment at Purem

Wannamaker-Amos worked as a quality engineer at Purem's manufacturing plant in Spartanburg, South Carolina. In this role, Wannamaker-Amos was not in charge of day-to-day quality assurance. She had no authority to direct or discipline production employees, nor did she have the authority to shut down a production line. Rather, she was responsible for implementing quality systems and troubleshooting customer complaints about defective parts. Her duties often required her to consult with manufacturing supervisors and team leaders who oversaw inspection and compliance, and with her direct supervisor, the quality manager responsible for quality assurance.

---

[2] In her Complaint, Wannamaker-Amos also alleged age discrimination. She does not appeal the district court's grant of summary judgment to Purem on that claim.

[3] At the summary judgment stage, a court must view the evidence in the light most favorable to the non-moving party and assume that the factfinder would resolve all genuinely disputed issues in her favor. *Alexander v. Connor*, 105 F.4th 174, 179 (4th Cir. 2024). We therefore present the facts in the light most favorable to Wannamaker-Amos.

Wannamaker-Amos reported to the Spartanburg quality manager, who in turn reported to the plant manager. Managers at the Spartanburg plant turned over rapidly. During her seven years at Purem, Wannamaker-Amos reported to at least four different quality managers, who in turn reported to at least two different plant managers. The praise for Wannamaker-Amos's work was consistent and nearly universal. Her supervisors lauded her work-ethic, skill, and conscientious performance of her duties. She often came to work early in the morning to handle extra responsibilities and worked late into the evening. Wannamaker-Amos's colleagues and third-party auditors also regarded her highly. Purem even selected her to travel to one of its facilities in Germany to implement her techniques and strategies.

In 2019, Purem relocated its Hyundai manufacturing line from Alabama to Spartanburg. In recognition of Wannamaker-Amos's skills, Purem designated her as the point person for the line. The Spartanburg quality manager to whom she reported at the time expressed confidence in Wannamaker-Amos's ability to support the production line and complete the Hyundai launch, which had been floundering. When Wannamaker-Amos assumed the role, the Hyundai transition was 600 days behind schedule. According to Wannamaker-Amos, the quality manager told her that everyone in management "knew the Hyundai launch would fail and were trying to distance themselves from it." J.A. 159. Wannamaker-Amos turned things around. Only months after assuming her new role, Wannamaker-Amos had obtained all the necessary approvals from Hyundai to begin production in Spartanburg. Her immediate supervisors and the plant manager complimented Wannamaker-Amos on her job performance. Dave Eppstein, a Purem

4

corporate official who oversaw all of the plant managers, praised Wannamaker-Amos for successfully completing the Hyundai transition.

### B. Purem Executive Javad Hosseini's Treatment of Wannamaker-Amos

The only supervisor who offered anything but praise for Wannamaker-Amos was Javad Hosseini. Hosseini was the director of quality at Purem. His job was to oversee quality management at all Purem manufacturing plants, including the Spartanburg facility, from his office at Purem headquarters in Novi, Michigan. Hosseini temporarily stepped in as Wannamaker-Amos's direct supervisor when the quality manager position at Spartanburg became vacant towards the end of 2019. In his roughly 10 years working for Purem as director of quality, Hosseini recalls directly supervising only one other Black employee.

Robin Shollack, a former Purem supervisor, testified that Hosseini treated Wannamaker-Amos poorly even prior to becoming her interim direct supervisor. According to Shollack, Hosseini consistently disfavored Wannamaker-Amos in comparison to the white men he supervised. In Shollack's words: "if Carmen didn't do something, it was a big issue; if the guys didn't do something, it was not a big issue." J.A. 91. Shollack described one occasion where Hosseini falsely blamed Wannamaker-Amos for performance deficiencies of a white male employee. Shollack testified that Hosseini's dismissiveness and disrespect towards women extended beyond Wannamaker-Amos. Shollack described an incident in which Hosseini barely reacted when she told him that a white male employee had used sexist expletives towards her and another female manager.

5

In addition to Hosseini's general pattern of wrongly blaming and unjustly scrutinizing Wannamaker-Amos, Shollack described one occasion when Hosseini made an explicitly racist comment about Wannamaker-Amos. According to Shollack, in 2017 Hosseini baselessly criticized Wannamaker-Amos's job performance, claiming that she was failing to complete her work. Shollack testified that during this conversation, Hosseini said, "[y]ou know how these [B]lack people are." J.A. 65. After Shollack visibly reacted to this comment, Hosseini attempted to walk it back, stating: "[y]ou know those southern people, they work very slow." J.A. 65.

During the years between his racist comment about Wannamaker-Amos and her termination, Hosseini tried repeatedly but unsuccessfully to convince Wannamaker-Amos's immediate supervisors to fire her. On one occasion, Hosseini told Shollack that he had asked Charl Greeff, the Spartanburg plant manager, to fire Wannamaker-Amos. On another occasion, Hosseini falsely accused Wannamaker-Amos of incorrectly inputting information into a company software platform when, in fact, she was the only employee who had been properly doing so. Richard Holland, another supervisor, told Shollack that Hosseini once became irate at Wannamaker-Amos over something that was not her responsibility. Following this incident, Hosseini told Holland, "we need to get rid of Carmen." J.A. 100. On a separate occasion, Wannamaker-Amos overheard Hosseini tell Lou Nespeca, a Purem quality manager, that Nespeca would soon have an opening on his team because Nespeca would be firing Wannamaker-Amos. Each of these incidents occurred before Wannamaker-Amos was assigned to the Hyundai project.

6

Wannamaker-Amos's supervisors protected her from Hosseini's efforts to have her fired. Indeed, they warned her about Hosseini. Greeff told Wannamaker-Amos that he "needed [her] in [her] position" and had rebuffed Hosseini's recommendation to fire her. Despite Hosseini's efforts to undermine her, Wannamaker-Amos's direct supervisors lauded her "skills and potential" and continued to entrust her with critical assignments. J.A. 32.

### C. Termination of Wannamaker-Amos's Employment

Subsequent to Purem launching the Hyundai production line in Spartanburg, Hyundai began to report quality issues with Purem parts. On December 19, 2019, Hyundai emailed Wannamaker-Amos and three other Purem employees complaining about a catalytic converter that had been delivered with a missing exhaust pipe. Hyundai asked Purem to develop a "countermeasure" to address the problem within four days. A countermeasure requires an engineer to determine the root cause of a problem and to decide what steps are necessary to correct it and prevent it from happening going forward. Wannamaker-Amos responded to Hyundai that same day. She informed Hyundai that she had initiated an investigation and containment of the issue but would need more time to develop a countermeasure. Wannamaker-Amos could not develop a countermeasure on her own because she needed information and technical assistance from others.

Several days after Hyundai emailed Purem about the missing exhaust pipe issue, both Hyundai and Purem closed down for the winter holidays. Although Purem was closed, Wannamaker-Amos worked with Hyundai during her vacation to address the missing pipe

7

issue. She was unable to complete the task, however, because she had yet to receive the necessary information and technical assistance.

Shortly following the holiday break, on January 7, 2020, a Hyundai manager emailed Hosseini and two other Purem executives with a list of three outstanding issues, one of which was the missing pipe issue that had yet to be resolved. Wannamaker-Amos was not copied on that email. That afternoon, Purem convened a group, including Hosseini, Wannamaker-Amos, and other managers, to prepare a draft response to Hyundai. After the meeting concluded, no one from Purem responded to Hyundai's email.

The next day, the Hyundai manager called Hosseini directly to complain about the lack of response to his email. Hosseini testified that the Hyundai manager was "incredibly angry." J.A. 573. After the call, Hosseini instructed Wannamaker-Amos to email the Hyundai manager, and she immediately complied. Later that day, Hosseini emailed Wannamaker-Amos's plant manager Andrew Breidigam and the plant human resources manager Kelly Kosek requesting Wannamaker-Amos's termination.

In his email to Kosek and Breidigam, Hosseini claimed that Wannamaker-Amos's poor performance had led to "several customer complaints and escalations and also significant financial damages to the company." J.A. 43. Hosseini appended to his email a list of eight alleged performance problems (Hosseini's list). The final item on Hosseini's list was Wannamaker-Amos's alleged failure to contain the missing pipe problem and to respond to Hyundai's email. Purem approved Hosseini's request to fire Wannamaker-Amos.

8

Two days later, on January 10, 2020, Kosek and Hosseini met with Wannamaker-Amos to inform her that she was being terminated. Wannamaker-Amos testified that Hosseini told her in the meeting that she was being terminated because she had failed to email the Hyundai manager after the January 7, 2020, meeting. Wannamaker-Amos responded that she had not been directed to do so. She explained that Hosseini had asked for a draft email by close of business that day so that he himself could communicate with the Hyundai manager. Wannamaker-Amos testified that she delivered a draft to Hosseini.

According to Hosseini, during the termination meeting Wannamaker-Amos accused him of firing her for a non-performance reason, suggesting she was being fired because she is Black. Hosseini denied this accusation. He told her that it was "not true" that her termination was because of her race. J.A. 613. Hosseini allegedly became so angry during the termination meeting that Kosek asked him to leave the room. After Wannamaker-Amos was terminated, Purem filled her position with a white male employee.

### D. Purem's Performance Improvement Policy

At the time Wannamaker-Amos was terminated, Purem had in place a performance improvement policy. The policy laid out a comprehensive process for progressive discipline. If an issue arose, the policy required a supervisor to advise the employee of the specific improvements necessary for the employee's performance to return to an acceptable level. If the employee failed to make sustained improvements following verbal coaching, or, if immediately warranted, the policy permitted a supervisor to issue a first written warning.

9

Under the policy, only in the event of "serious" misconduct could an employee be terminated without counseling or a written warning. J.A. 73. The policy provided examples of serious misconduct that were, indeed, quite serious. They included deliberate and unauthorized use of, or damage to, company property, bringing dangerous weapons or alcohol or non-medical drugs on work premises, theft, or assault. The policy also permitted termination for "gross negligence," which was defined as "deliberate and intentional" misconduct. J.A. 74.

Hosseini conceded that he did not consult or follow Purem's performance improvement policy before terminating Wannamaker-Amos. He did not counsel Wannamaker-Amos or give her an opportunity to improve her performance. Prior to her termination, Purem never issued a warning to Wannamaker-Amos or cited her for any infraction. Wannamaker-Amos was never shown the list of the eight alleged performance issues Hosseini had compiled.

Purem also did not provide the list of Wannamaker-Amos's eight alleged performance issues in its response to the Equal Employment Opportunity Commission (EEOC) explaining its basis for firing her. To the contrary. Before the EEOC, Purem raised for the first time a wholly new issue: an alleged incident involving Wannamaker-Amos and a FedEx account. On appeal, Purem downplays the significance of seven of the eight alleged performance problems on Hosseini's list. Purem now describes Wannamaker-Amos's alleged failure to send the email to Hyundai as the one "legitimate business reason" for her termination, characterizing the first seven alleged performance problems on Hosseini's list as "not material." Appellee Br. at 21. Purem's corporate

10

representative conceded in his deposition that there was no evidence substantiating several of the items on Hosseini's list. Significantly, the corporate representative conceded that there was also no evidence to support Hosseini's assertion that the company had suffered financial damages as a result of Wannamaker-Amos's allegedly poor performance.

## II. Standard of Review

We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Shaw v. Foreman*, 59 F.4th 121, 129 (4th Cir. 2023). Thus, we "construe all facts and reasonable inferences in the light most favorable to the nonmoving party" and ask whether genuine disputes of material fact preclude judgment as a matter of law. *Id.* (citing Fed. R. Civ. P. 56(a)). This court has emphasized that "the aim of summary judgment is not to determine the exact strength of a case and dispose of so-called weak cases, but instead to determine whether a rational jury *could* find in the plaintiff's favor." *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 412 (4th Cir. 2022) (emphasis in original). For this reason, we "examine the course of a plaintiff's conduct through a panoramic lens, viewing the individual scenes in their broader context and judging the picture as a whole." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015). In a Title VII case such as this one, we must not weigh facts, but rather we must consider whether all the material evidence a plaintiff has put forward is enough for a reasonable jury to be able to conclude that the plaintiff was subjected to intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000); *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 295 (4th Cir. 2010).

## III. Analysis

11

Title VII makes it unlawful for an employer to discriminate against an individual on the basis of race or sex, among other protected categories. 42 U.S.C. § 2000e *et seq.* A plaintiff may prove discrimination through either of two methods: (1) direct evidence of discrimination, or (2) through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and its progeny. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019).[4] Under the *McDonnell Douglas* framework, a plaintiff must make out a *prima facie* case of discrimination. *Id.* The burden of production then shifts to the employer to articulate a legitimate, non-discriminatory justification for its allegedly discriminatory action. *Id*. If the employer carries this burden, the plaintiff then must prove by a preponderance of the evidence that the neutral reasons offered by the employer "were not its true reasons, but were a pretext for discrimination." *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

As this court explained in *Merritt*, "[n]otwithstanding the intricacies of proof schemes, the core of every Title VII case remains the same, necessitating resolution of 'the ultimate question of discrimination.'" 601 F.3d at 294-95 (quoting *U.S. Postal Serv. Bd. of*

---

[4] In her Complaint, Wannamaker-Amos asserts two claims of race discrimination, one under Title VII and the other under Section 1981. In her appellate briefs, she maintains her Title VII discrimination claims but does not expressly reference Section 1981. While the *McDonnell Douglas* framework was initially developed for Title VII discrimination cases, it has since been held to also apply in discrimination cases arising under Section 1981. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989); *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001). A plaintiff-appellant does not forfeit her Section 1981 claim merely because her counsel neglected to specify it separately from the Title VII claim on appeal. *See Lightner v. City of Wilmington*, 545 F.3d 260, 263 n.1 (4th Cir. 2008). Thus, our analysis applies equally to Wannamaker-Amos's Title VII and Section 1981 race discrimination claims.

*Governors v. Aikens*, 460 U.S. 711, 714 (1983)). Courts must therefore "resist the temptation to become so entwined in the intricacies of the [*McDonnell Douglas*] proof scheme that they forget that the scheme exists solely to facilitate determination" of the ultimate question of discrimination. *Id.* at 295 (internal quotation and citation omitted).

## A.  *Prima Facie* Case

We turn first to step one of the *McDonnell Douglas* framework. To establish a *prima facie* case of discrimination, "a plaintiff must show that (1) she is a member of a protected class; (2) her employer took an adverse action against her; (3) she had been fulfilling her employer's legitimate expectations at the time of the adverse action; and (4) the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 649-650 (4th Cir. 2021). "The burden at this stage 'is not onerous,' and meeting it 'in effect creates a presumption that the employer unlawfully discriminated against the employee.'" *Westmoreland v. TWC Admin., Inc.*, 924 F.3d 718, 725 (4th Cir. 2019) (quoting *Burdine*, 450 U.S. at 253-54). Wannamaker-Amos met this burden.

Purem contests only the third factor. There is no dispute that Wannamaker-Amos is a Black woman, that she was fired, and that Purem replaced her with a white man. *See Lettieri v. Equant*, 478 F.3d 640, 647 (4th Cir. 2007) (explaining that evidence that a plaintiff's job was filled by an individual outside of her protected class supports a reasonable inference of discrimination). Here, the only question at the *prima facie* stage is whether Wannamaker-Amos was, in fact, performing her job at a satisfactory level at the time of her termination. To satisfy this factor, Wannamaker-Amos need not "show that

13

[s]he was a perfect or model employee," only "that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 380 (4th Cir. 2022) (quoting *Haynes*, 922 F.3d at 225).

In arguing that Wannamaker-Amos failed to make this showing, Purem contends that Hosseini sought her termination "after months of subpar performance culminated in her complete failure to respond to a critical customer quality issue." Appellee Br. at 3. Purem highlights the eight incidents on Hosseini's list. Characterizing these shortcomings as undisputed evidence that Wannamaker-Amos was not fulfilling her employer's legitimate expectations, from this Purem argues that she failed to meet her *prima facie* burden. *Id.* at 27-28.

This argument must be rejected. First, Wannamaker-Amos put forward ample evidence to demonstrate a material issue of fact as to all eight incidents. Indeed, Purem itself disavowed all but one of them as "not material." *Id.* at 21. Wannamaker-Amos introduced evidence that Hosseini's criticisms of her performance were baseless and had been repeatedly rejected by her supervisors. Moreover, she produced evidence that she was well-regarded by her supervisors, with the notable exception of Hosseini. Shollack offered highly favorable testimony about Wannamaker-Amos's job performance, noting that she was held in high esteem by quality managers, plant managers, peers, and third-party auditors. Only several months prior to her termination, the Spartanburg plant manager and a Purem corporate official lauded Wannamaker-Amos for successfully starting up the Hyundai production line, an enormously difficult task.

14

The second fatal flaw in Purem's argument is that it relies exclusively upon statements made by Hosseini, the alleged discriminator. No other management official provided testimony supporting Purem's assertion that Wannamaker-Amos was not fulfilling its legitimate expectations at the time of her termination. As the Seventh Circuit aptly noted, it "makes little sense . . . to discuss whether [a plaintiff] was meeting her employer's reasonable expectations" when "the people judging [her] performance were the same people she accused of discriminating against her." *Curry v. Menard, Inc.*, 270 F.3d 473, 477-78 (7th Cir. 2001). Where an employer's allegations of poor performance are inextricably intertwined with the employee's claims of discrimination, we cannot give greater weight to the alleged discriminating official's criticisms of the employee's performance than to the employee's evidence disputing such criticisms. Purem's only evidence that Wannamaker-Amos was not fulfilling its legitimate expectations at the time of the adverse employment action comes from Hosseini, the alleged discriminating official. That alone is insufficient to defeat Wannamaker-Amos's *prima facie* case. To hold otherwise would turn the *McDonnell Douglas* burden shifting framework on its head.

## B. Employer's Burden of Production

At the second *McDonnell Douglas* step, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (quoting *Hill v. Lockheed Martin Logistics Mgmt.*, 354 F.3d 277, 286 (4th Cir. 2004)). The employer's burden at this stage "is one of production, not persuasion; it can involve no credibility assessment." *Reeves*, 530 U.S. at 142 (internal citation omitted). Once "an employer

15

articulates a reason for discharging the plaintiff not forbidden by law," we do not evaluate "whether the reason was wise, fair, or even correct." *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (internal quotations omitted).

Purem claims Wannamaker-Amos was fired because she failed to timely respond to Hyundai's December 19, 2019, complaint about the defective catalytic converter with the missing exhaust pipe.[5] Purem produced evidence sufficient to shift the burden back to Wannamaker-Amos.

### C. Employee's Burden to Prove Pretext

We now turn to the third and final step under *McDonnell Douglas*. Here, the burden shifts back to Wannamaker-Amos to produce evidence sufficient to create a material issue of fact as to whether Purem's alleged reason for firing her was not its true reason, but rather a pretext for discrimination. *Haynes*, 922 F.3d at 223. A plaintiff may establish pretext through two routes. The first is offering evidence that the employer's justification is "unworthy of credence." *Reeves*, 530 U.S. at 143 (quoting *Burdine*, 450 U.S. at 256). As the Supreme Court explained in *Reeves*, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 134. The second is adducing other forms of circumstantial evidence sufficiently probative of discrimination. *Id.* at 147. "Proof that the defendant's explanation is unworthy

---

[5] We note that Purem has provided shifting reasons for terminating Wannamaker-Amos. Because the employer's burden at this stage is one of "production, not persuasion," *Reeves*, 530 U.S. at 142, we address those inconsistencies in our pretext analysis, not here.

16

of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id.* If the plaintiff makes either showing of pretext, the case must be decided by a trier of fact and cannot be resolved on summary judgment. *Sempowich*, 19 F.4th at 652. Wannamaker-Amos met this burden in multiple ways.[6]

### i.     Evidence of Falsity

A plaintiff may establish pretext through evidence that an employer's purported nondiscriminatory reason for her termination is false. *Sempowich*, 19 F.4th at 652. Purem claims that it fired Wannamaker-Amos because she failed to respond to Hyundai's email after Hosseini directed her to do so. Wannamaker-Amos submitted ample evidence to dispute this assertion. The parties agree that Wannamaker-Amos and Hosseini participated in a meeting to discuss an appropriate response to Hyundai's email. There the agreement ends, however. The record is inconclusive as to who was responsible for sending the response to Hyundai after the meeting. Hosseini claims he directed Wannamaker-Amos to do so. Wannamaker-Amos insists that he did not.

Hyundai addressed its email complaining about the missing pipe to Hosseini and other high-level executives at Purem. Because she was not included on that email, Wannamaker-Amos argues that it would have been inappropriate for her to send the

---

[6] Before the district court, Wannamaker-Amos attempted to demonstrate pretext through comparator evidence. While comparator evidence is one way to demonstrate pretext, *Haynes*, 922 F.3d at 223-25, Wannamaker-Amos has largely abandoned this argument on appeal. Because we find that Wannamaker-Amos has successfully demonstrated pretext through other methods, we decline to evaluate comparator evidence.

response. Drawing all inferences in Wannamaker-Amos's favor, as we must, we find that a reasonable jury could disbelieve Purem's alleged justification that Wannamaker-Amos was responsible for sending a response to Hyundai and was fired for failing to do so.

ii.    Shifting, Conflicting Reasons

Wannamaker-Amos has also provided evidence that Purem's alleged reasons for firing her have changed over time. This too can demonstrate pretext. *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001) ("The fact that [the employer] has offered different justifications at different times . . . is, in and of itself, probative of pretext."). When Hosseini asked Breidigam and Kosek to fire Wannamaker-Amos, he asserted that her "poor performance" had led to customer complaints and caused "significant financial damages to the company." J.A. 43. He also provided the list he had prepared cataloging eight alleged performance problems, the last of which was her alleged failure to respond to Hyundai's email.[7] Notably, Purem chose not to provide this list to the EEOC in response to Wannamaker-Amos's discrimination complaint. Instead, before the EEOC, Purem raised a previously unmentioned incident involving Wannamaker-Amos's alleged failure to send Hyundai certain FedEx account information. Further, in addition to

---

[7] A jury can also infer pretext from a decisionmaker's effort to build a file of issues never discussed with the plaintiff. *E.g.*, *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 403, 407 (4th Cir. 2005); *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502-03 (4th Cir. 2001). Documentation created at the time of termination which relies on past events for which there is no contemporaneous documentation may be evidence of pretext. *E.g.*, *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 239-40 (5th Cir. 2015). Wannamaker-Amos was never shown Hosseini's list of alleged performance deficiencies. Hosseini claimed in his deposition that he verbally coached Wannamaker-Amos on each of the issues on the list, but nothing in the record corroborates this assertion and Wannamaker-Amos flatly denies it.

18

conceding that there was no evidence to support Hosseini's initial assertion that Wannamaker-Amos had caused significant financial damage to the company, Purem's corporate representative acknowledged that the company had no real evidence to support many of the other alleged performance deficiencies in Hosseini's list. In his email requesting Wannamaker-Amos's termination, Hosseini emphasized that Wannamaker-Amos "caused several customer complaints and escalations." J.A. 43. On appeal, however, Purem states that Wannamaker-Amos "was never criticized and certainly was not terminated for the number of complaints incurred." Appellee Br. at 42 n.8. Instead, Purem now asserts that the Hyundai email was the "legitimate business reason that actually and truly motivated Wannamaker-Amos's termination." *Id.* at 34-35. It describes the remaining seven issues as "not material." *Id.* at 21. Purem never again mentioned the FedEx incident it raised for the first time before the EEOC.

Although an employer may have multiple legitimate reasons for firing an employee, its effort to retract certain reasons initially offered by the decisionmaker may suggest that none of those reasons were ever the true reasons and instead were pretext for discrimination. *See Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 733 (4th Cir. 1996) (finding that where a plaintiff cast doubt on 16 of the 18 incidents her employer relied upon in explaining her demotion, a jury "might reasonably conclude that [the employer] used the two remaining incidents," though factually undisputed, "as a pretext for age-based discrimination."). Here, Wannamaker-Amos has cast doubt upon all eight alleged incidents in Hosseini's list. Purem's subsequent efforts to minimize certain incidents while raising an entirely new one before the EEOC could allow a reasonable factfinder to conclude that

19

Purem's entire story was "invented for the purposes of litigation" and "not a legitimate explanation for [its] decision." *Merritt*, 601 F.3d at 298 (internal quotations omitted). "Evidence of substantial changes to [an employer's] proffered reason for the termination permits an inference of pretext." *Haynes*, 922 F.3d at 226. Because Purem "offered different justifications at different times," *Sears*, 243 F.3d at 852, a reasonable jury could conclude that Purem's shifting, conflicting reasons for firing Wannamaker-Amos were a pretext for discrimination.

iii.      Evidence of Discriminatory Animus

Another way a plaintiff may show pretext is by offering circumstantial evidence of discrimination. *Reeves*, 530 U.S. at 147. Such evidence often comes in the form of conduct or circumstances probative of discriminatory animus. *Merritt*, 601 F.3d at 300 ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.") (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation and internal quotations omitted)). Shollack testified that Hosseini treated Wannamaker-Amos poorly in comparison to his other employees, all of whom were white, and most of whom were men. According to Shollack, Hosseini held Wannamaker-Amos to a higher standard and unfairly blamed her for others' performance failings. Shollack described one occasion when Hosseini falsely accused Wannamaker-Amos of incorrectly inputting information into the systems and audits software, when in fact Wannamaker-Amos was the only employee who had been doing so properly. Wannamaker-Amos testified that Hosseini regularly ignored her input, cut her

20

off when she spoke, and assigned her menial tasks, such as notetaking, that he did not assign to white male employees.

On multiple occasions over several years, Hosseini sought to have Wannamaker-Amos fired. He criticized Wannamaker-Amos for performance issues her supervisors told him were baseless. The exchange between Shollack and Hosseini in 2017 is particularly probative. Shollack testified that Hosseini criticized Wannamaker-Amos for allegedly failing to complete her work and then stated about her: "[y]ou know how these [B]lack people are." J.A. 65. Although Hosseini denies that this exchange occurred, on summary judgment we must credit it. *See Lewis v. Caraballo*, 98 F.4th 521, 528-29 (4th Cir. 2024).

Discriminatory comments by key decisionmakers can serve as circumstantial evidence of pretext under the *McDonnell Douglas* framework, even if the comments are not direct evidence of discrimination with respect to the specific employment decision at issue. "[L]anguage not amounting to direct evidence, but showing some racial animus, may be *significant* evidence of pretext once a plaintiff has set out the *prima facie* case." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1362 (11th Cir. 1999) (emphasis in original) (internal quotation and citation omitted). This is particularly true where the discriminatory comments relate to the employee's qualifications, performance, or character. Such comments are far more likely to persuade a jury of discriminatory animus than generalized comments about the employee's protected class. Relevant factors to consider in weighing such evidence can include "the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged

21

decision." *Griffin v. Finkbeiner*, 689 F.3d 584, 595 (6th Cir. 2012); *see also Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998).

A reasonable jury could readily infer animus from Hosseini's remark about Wannamaker-Amos's work and "these [B]lack people," J.A. 65, particularly when coupled with his years-long effort to have Wannamaker-Amos fired. While the comment was made two years before she was terminated, Wannamaker-Amos produced a raft of evidence that Hosseini persistently urged her firing between the time of the comment and her termination, well before any alleged issues emerged with the Hyundai line. Should the jury credit Wannamaker-Amos's and Shollack's testimony, it could readily find that Hosseini harbored animus towards Wannamaker-Amos based on her race or gender (or both) and was simply waiting for an opportunity to fire her. *See Cowgill*, 41 F.4th at 383 (finding evidence that "would allow a trier of fact to think [the employer] was simply looking for a reason to get rid of [the employee]" indicative of pretext (quoting *Merritt*, 601 F.3d at 296)).

That the discriminatory comment was made by the ultimate decisionmaker is highly significant. This court has recognized that "[i]t is regrettable that any distasteful comments will arise in the workplace, but that cannot mean that the actual decision maker is impugned thereby. It is the decision maker's intent that remains crucial." *Merritt*, 601 F.3d at 300. Where, as here, the speaker was "in a position to influence the alleged decision," a discriminatory comment can qualify as evidence that a particular decision was discriminatory. *Ercegovich*, 154 F.3d at 355. This is true even if the comment was not

22

contemporaneous with the adverse employment action. Temporal proximity is but one factor to be considered when the speaker is also the decisionmaker or is in a position to influence the alleged decision, particularly when the discriminatory comment relates directly to the plaintiff's job performance.

### iv.      Employer's Failure to Follow Disciplinary Policies

Evidence that a company failed to follow its own disciplinary policies in firing an employee can also be probative of pretext. *E.g.*, *Cowgill*, 41 F.4th at 383; *Westmoreland*, 924 F.3d at 728. That is because an employer's "extreme overreaction" to a minor infraction may suggest that the relevant decisionmaker was "looking for a reason to get rid of [the plaintiff]" on discriminatory grounds. *Westmoreland*, 924 F.3d at 728 (first quote); *Cowgill*, 41 F.4th at 383 (second quote). Even if we were to take as true that Hosseini ordered Wannamaker-Amos to respond to Hyundai's email by the end of the day on January 7, 2020, and that she failed to do so, a jury could reasonably conclude that terminating her on this basis alone was contrary to Purem's performance improvement policy.

Purem's policy set out the process to be "followed to address on-the-job problems." J.A. 73. It was "intended to protect and preserve [employees'] rights and to provide a framework under which fair treatment is afforded to all team members." *Id.* The policy called for progressive responses to work-related issues, including verbal coaching, three written warnings, and termination. Under the policy, an employee's first infraction for negligence or poor work performance warranted a "first written warning." J.A. 73. Immediate termination would only be appropriate in instances of serious acts of

23

misconduct, including theft and other criminal acts, dangerous behavior on work premises, drug and alcohol use at work, and "gross negligence[,] i.e. deliberate and intentional" misconduct. J.A. 74.

Wannamaker-Amos was never the subject of discipline during her seven years at Purem. She did not receive a single warning and had never been cited for any infractions before she was terminated. Indeed, there is no documented evidence of any supervisor criticizing Wannamaker-Amos's performance prior to Hosseini forwarding his list of alleged performance issues to Breidigam and Kosek. Nothing in the record suggests that Wannamaker-Amos intentionally refused to email Hyundai, or that Purem routinely regards a failure to respond to a customer email within a single day as serious misconduct. Under the circumstances, even if a jury concluded that Wannamaker-Amos failed to respond to Hyundai after being instructed to do so, it could reasonably conclude that this failure was merely negligent. A jury could thus conclude that, pursuant to Purem's performance improvement policy, Wannamaker-Amos should have received only verbal coaching. Moreover, "the jury could reasonably have questioned whether firing [Wannamaker-Amos] for one infraction that did not require termination was such an extreme overreaction as to be pretextual." *Westmoreland*, 924 F.3d at 728 (internal quotations omitted).

Purem insists that Hosseini never followed Purem's disciplinary policy, and therefore his failure to do so here cannot be evidence of pretext. Hosseini's request that Wannamaker-Amos be fired was his sole recorded request for disciplinary action against an employee during his entire 17-year tenure at Purem. Routine failure to follow company

24

policy does not negate the weight of evidence in a particular case. A reasonable jury could find pretext because Hosseini treated his only Black female employee less favorably than white male employees by singling her out for scrutiny and punishment. Such a conclusion would be consistent with Shollack's testimony that Hosseini held Wannamaker-Amos to a higher standard than he held white male employees, while excusing performance issues of white male employees.

v.       Refusal to Speculate as to Employer's Motivation

Finally, Purem argues that Wannamaker-Amos cannot establish pretext because "she herself does not believe there was intentional discrimination." Appellee Br. at 44. The record demonstrates the opposite to be true.

During her deposition, Wannamaker-Amos testified that she believed Hosseini treated her differently than the other employees in her department—all of whom were white, and all but one of whom were male—and that he openly favored the men in her department. She gave several examples of this disparate treatment. She further testified that she believed Hosseini held a negative view of her job performance because of her race, and had instructed her supervisors to check on her often "because you know how those [B]lacks are down there." J.A. 567.

When asked directly why she believed that Hosseini had discriminated against her, Wannamaker-Amos declined to speculate.[8] Purem seizes on her unwillingness to speculate

---

[8] Notably, although Wannamaker-Amos declined to speculate during her deposition as to the reasons why Hosseini treated her adversely, Hosseini testified that, at the time of her termination, Wannamaker-Amos suggested that she was fired because or her race. (J.A. 613.)

about Hosseini's motivation to assert that "[n]o reasonable juror could believe Wannamaker-Amos's explanation of intentional discrimination." Appellee Br. at 44. We disagree both with Purem's characterization of Wannamaker-Amos's testimony and with Purem's assessment of the import a reviewing court should place on such testimony at summary judgment. While a plaintiff's unequivocal admission that she was not discriminated against may warrant summary judgment, s*ee, e.g.*, *Lightner*, 545 F.3d at 263-64 (explaining that plaintiff admitted he was suspended to halt an ongoing investigation, not because of race), a plaintiff's uncertainty about what the alleged discriminating official felt should not.

Wannamaker-Amos's refusal to speculate as to Hosseini's motivation may reflect uncertainty about *which* protected class was the basis for the alleged discrimination rather than *whether* discrimination occurred at all. "[S]ome cases present evidence that points to discrimination occurring not only because of the plaintiff's sex, but because of both sex and some other characteristic." *Westmoreland v. Prince George's County*, 876 F. Supp. 2d 594, 604 (D. Md. 2012) (internal citation omitted). A growing body of authority, including in district courts in our own circuit, recognizes that Title VII may contemplate "intersectional" claims by plaintiffs who face discrimination on account of a combination of more than one protected ground.[9] *See, e.g.*, *Bliss v. Garland*, 2023 WL 4627435, *5-6 (E.D. Va. July 19, 2023) (allowing sex plus race plus national origin claim to proceed as an intersectional discrimination claim); *Westmoreland*, 876 F. Supp. 2d at 604; *Jeffers v.*

---

[9] Because Wannamaker-Amos does not assert an intersectional discrimination claim, we do not address this issue today.

*Thompson*, 264 F. Supp. 2d 314, 327 (D. Md. 2003); *see also Lam v. Univ. of Haw.*, 40 F.3d 1551, 1562 (9th Cir. 1994).

We reject Purem's assertion that an employee must affirmatively "proclaim" the reason why her employer engaged in unlawful discrimination in order to survive summary judgment. Appellee Br. at 4. No such rule exists in our caselaw, and we decline to adopt one here. We have repeatedly held that plaintiffs cannot rely solely on their own speculation or conjecture to support a cause of action of discrimination. *E.g.*, *Massaro v. Fairfax County*, 95 F.4th 895, 905 (4th Cir. 2024); *Robinson v. Priority Auto. Huntersville, Inc.*, 70 F.4th 776, 780 (4th Cir. 2023); *McIver v. Bridgestone Am., Inc.*, 42 F.4th 398, 409 (4th Cir. 2022); *Love-Lane v. Martin*, 355 F.3d 766, 789 (4th Cir. 2004). It would be anomalous to hold that a plaintiff cannot sustain a discrimination claim without engaging in precisely the type of speculation we have repeatedly disavowed. Just as speculation is insufficient to prove a discrimination claim, a plaintiff need not speculate as to the alleged discriminator's motive to survive summary judgment.

## IV. Conclusion

Where genuine issues of material fact are in dispute, it is not our role at the summary judgment stage to decide which party's evidence is more persuasive. That is the role of the jury. Viewing the evidence in the light most favorable to Wannamaker-Amos, a reasonable jury could find that her acting supervisor harbored discriminatory animus towards her, built a case against her based on misleading allegations, and ultimately procured her termination on unlawful grounds. Wannamaker-Amos met her burden to introduce evidence of pretext.

27

Accordingly, we vacate the grant of summary judgment and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*