**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1766**

---

DEREK CHAPMAN

　　　　Plaintiff - Appellant

v.

MARYLAND DEPARTMENT OF STATE POLICE, Office of the State Fire Marshal

　　　　Defendant - Appellee

---

Appeal from the United States District Court for the District of Maryland, at Baltimore. Albert David Copperthite, Magistrate Judge.  (1:23-cv-00442-ADC)

---

Submitted:  August 12, 2025　　　　　　　　　Decided:  November 7, 2025

---

Before BENJAMIN and BERNER, Circuit Judges, and KEENAN, Senior Circuit Judge.

---

Affirmed by unpublished per curiam opinion.

---

**ON BRIEF:**  Dionna Maria Lewis, DISTRICT LEGAL GROUP, PLLC, Washington, D.C., for Appellant.  Anthony G. Brown, Attorney General, Phillip M. Pickus, Assistant Attorney General, Kyle A. Ashe, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Pikesville, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Derek Chapman brought this action against his employer, the Maryland Department of State Police, Office of the State Fire Marshal (the Office), after being disciplined for failing to submit timely reports. Chapman alleges discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. §§ 2000e through 2000e-17. He now appeals from the district court's award of summary judgment in favor of the Office. After reviewing the record, we conclude that Chapman failed to meet his burden to show that the Office's reasons for disciplining him were pretextual. We therefore affirm the district court's award of summary judgment on both claims.

I.

In 1998, the Office hired Chapman as a Deputy State Fire Marshal. In that role, he was responsible for investigating fires and completing his "fire investigation reports." These fire reports examine where and how a fire or explosion began and whether a fire was accidentally or intentionally set. The fire reports also are used by state prosecutors in determining whether to bring a criminal case regarding a fire and are used by insurers to make decisions about claims and coverage.

In June 2018, Chapman was promoted to Deputy Chief State Fire Marshal and Commander of the Northeast Regional Office. In his new role, Chapman supervised eight investigators. He was responsible for reviewing each of these investigators' fire reports and for ensuring that the reports were submitted. Chapman also conducted his own investigations and oversaw various administrative tasks.

It is undisputed that Chapman was behind in completing the required fire reports both before and after his promotion to Deputy Chief Fire Marshal. Before his 2018 promotion, Chapman estimated that he had 20–30 overdue fire reports. When asked about the backlog during his interview for deputy chief, he responded that he would take action to complete the outstanding reports. The issue of backlogged reports was not limited to Chapman. As of February 2018, the Northeast Regional Office had a total of 261 open[1] fire reports. After Chapman's promotion, Chief Deputy State Fire Marshal Gregory Der (Chief Der) instructed Chapman to develop a "plan to catch up on some of the late initial reports in [the Northeast] region." J.A. 113.

Chapman, however, was unable to materially reduce the number of late reports in his region. In fact, an internal investigation found that the Northeast region had 282 overdue reports as of June 2019, and 239 overdue reports as of June 2021, numbers that far exceeded those of any other region. Nor was Chapman able to reduce his personal backlog of reports. Chapman had 36 late reports as of June 2019, and 40 late reports as of March 2021.

In early 2021, the Office began taking a more direct approach to resolving the backlog of reports. On February 9, 2021, Chief Der emailed Chapman and the other deputy chiefs who had overdue reports, Jason M. Mowbray and John A. Nelson, to provide lists

---

[1] The record uses "open" and "late" interchangeably to describe the fire investigation reports. To the extent there is a distinction, it does not affect our analysis.

identifying their respective late reports.  Mowbray and Nelson submitted their outstanding reports within a few weeks.

On February 18, 2021, Chief Der instructed Chapman to complete five reports by March 4, 2021.  Chapman did not complete the assignment.  On March 16, 2021, Chief Der ordered Chapman to "complete 10 late reports by the end of each month."  J.A. 151.  Chief Der also told Chapman that failure to complete the reports "may result in further action to ensure that these reports are completed."  *Id.*

A.

In March 2021, Chapman confronted State Fire Marshal Brian Geraci about racial discrimination in the Office.  Chapman, who is Black, noted that after he sent an email in 2020 suggesting that the Office recognize a Black inventor as part of Black History Month, Geraci joked about including "black dogs" in the celebration.  Additionally, Chapman reported that two deputy chiefs, Duane Svites and Carolyn McMahon, had a history of making inappropriate remarks.  Svites had requested a "Black driver" on one occasion, and McMahon had commented on "[c]olored, lazy black females at HQ."  J.A. 414.  According to Chapman, Svites earlier had been "reported" for inappropriately investigating Black churches and Black-owned businesses and for circulating an image depicting then-Vice President Joe Biden with "cornrows."  Chapman did not allege who had made those reports, when they were made, or whether further action had been taken regarding them.

On June 15, 2021, Chapman filed a formal "Fair Practice" complaint.  In addition to listing the remarks made by Svites and McMahon, the complaint also noted that Chapman had received emails from Svites and others that were intended for Deputy Chief

4

Dexter Hodges, another Black employee.  The complaint also included criticisms of (1) the manner in which Chapman's request for medical leave was handled, and (2) Chief Der's approach to resolving the overdue reports.

### B.

The next day, June 16, 2021, Chapman was stripped of his supervisory duties and was transferred to headquarters to receive "the necessary administrative resources needed to complete . . . backlogged reports." J.A. 158.  The transfer notice required that Chapman submit "a minimum of 5 reports per month" to Svites, his new "peer report evaluator." *Id.*  It is unclear the extent to which Svites was given supervisory authority over Chapman.  Regardless, Chapman failed to submit the required reports to Svites and missed at least two other deadlines that he was given for submission of the overdue reports.

On August 16, 2021, Chief Der filed a disciplinary complaint against Chapman for failing to "complete late/open reports" and failing to "supervise his subordinates by ensuring they submitted their late/open reports." J.A. 183.  Shortly thereafter, Chapman filed an internal complaint against Chief Der alleging harassment and discrimination.

In October 2021, the Office placed Chapman on emergency suspension, with pay.  The Office sent two uniformed deputies to Chapman's home to seize Chapman's firearm, badge, and department-issued vehicle.

While Chapman was suspended, the Office's Internal Affairs Division began an investigation of Chapman's and Chief Der's complaints.  The investigation concluded that Chapman's region had a far larger number of overdue reports than any other region, and that no other deputy chief had overdue personal reports as of November 2021.

5

Additionally, Internal Affairs Division personnel interviewed Chapman, who admitted that he had not completed his overdue reports, which constituted a violation of the Office's policy manual. Ultimately, the Internal Affairs Division sustained the charges against Chapman and dismissed Chapman's allegations against Chief Der. Chapman eventually resolved his backlog of reports in December 2023 and was restored to full duty.

C.

In February 2022, Chapman filed a charge of discrimination with the Maryland Commission on Civil Rights and Employee Equal Opportunity Commission (EEOC). The EEOC investigated Chapman's allegations and issued him a "Right to Sue" letter.[2] Chapman filed the present action against the Office in the district court, alleging, among other claims,[3] that in violation of Title VII, the Office (1) discriminated against him based on his race (Counts I & II) and (2) retaliated against him after he reported discriminatory comments (Count III). After discovery concluded, the district court granted the Office's motion for summary judgment. Chapman now appeals from the district court's judgment.

---

[2] When the EEOC dismisses a charge of discrimination or takes no remedial action within a certain time limit, the aggrieved employee may file a civil action in district court. 42 U.S.C. § 2000e-5(f). In this situation, the EEOC issued to the employee a "Right to Sue" letter, which serves as "a prerequisite to the jurisdiction of the federal courts." *See Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091, 1092–93 (4th Cir. 1982).

[3] The district court also dismissed Chapman's claims under the Maryland Fair Employment Practices Act, the Family and Medical Leave Act, and 42 U.S.C. §§ 1981, 1983. These claims are not at issue on appeal.

II.

"We review an award of summary judgment de novo." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019). "Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. (internal quotation marks omitted) (quoting Fed. R. Civ. P. 56(a)). In reviewing an award of summary judgment, we consider the facts in the light most favorable to the non-moving party, and we draw all reasonable inferences in the non-moving party's favor. *Id.*

III.

"Title VII forbids (i) employment practices that discriminate against an employee on the basis of race, color, religion, sex, or national origin . . . and (ii) retaliation against an employee for opposing adverse actions that she [or he] reasonably suspects to be unlawful under Title VII." *Strothers v. City of Laurel*, 895 F.3d 317, 326–27 (4th Cir. 2018) (citations omitted). When, as Chapman has done here, a plaintiff asserts discriminatory treatment under Title VII but does not allege direct evidence of discrimination, the plaintiff may proceed under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Haynes*, 922 F.3d at 223. This framework also applies to Chapman's retaliation claim. *Id.*

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff first must make out a prima facie case of retaliation or discrimination. *Hannah P. v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019). After the plaintiff establishes a prima facie case of retaliation or

7

discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory justification for its adverse employment action. *Haynes*, 922 F.3d at 223. If the employer satisfies this burden, the plaintiff then must prove by preponderance of the evidence that the employer's purportedly neutral reasons were pretext for discrimination or retaliation for protected activity. *Id.* Ultimately, the burden of persuasion rests with the plaintiff to show that he was subjected to race discrimination, or to retaliation for his protected activity. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).

Here, the district court held that Chapman failed at step one of the *McDonnell Douglas* framework, namely, that Chapman did not establish prima facie cases of discrimination and retaliation. The district court also determined that even if Chapman could establish prima facie cases, he failed to establish that the Office's reasons for disciplining him were pretextual.

We need not examine whether Chapman established prima facie cases, because we conclude that this case can be resolved succinctly by considering the issue of pretext, namely, whether Chapman failed to show that the Office's explanation for disciplining him was pretextual.[4] We therefore turn directly to review the evidence concerning the final two elements of the *McDonnell Douglas* framework.

---

[4] Accordingly, for purposes of this analysis, we assume, without deciding, that Chapman has established prima facie cases of discrimination and retaliation.

Under the first of these two final steps, we initially address whether the Office met its burden to produce evidence of a legitimate, nondiscriminatory or nonretaliatory basis for disciplining Chapman. *See Haynes*, 922 F.3d at 223. The answer here clearly is "yes." The record is unrefuted that despite being given many orders to reduce the number of overdue reports in his region and the number of late reports for which he was personally responsible, Chapman failed to do so.

We therefore turn to the final element of the *McDonnell Douglas* framework to determine if the record shows a material dispute on the issue of whether the Office's reasons for disciplining Chapman were pretextual. To show pretext, Chapman needed to demonstrate that the Office's reasons for disciplining him were false and that retaliation and/or discrimination was one reason for the Office's actions. *Foster v. Univ. of Maryland-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015). Chapman could do so by offering evidence that the Office's "'proffered nondiscriminatory reasons for the [the disciplinary actions] were inconsistent over time, false, or based on mistakes of fact.'" *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 652 (4th Cir. 2021) (quoting *Haynes*, 922 F.3d at 225). Chapman could also demonstrate pretext by "offering circumstantial evidence of discrimination." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 259 (4th Cir. 2025) (citing *Reeves*, 530 U.S. at 147). "Such evidence often comes in the form of conduct or circumstances probative of discriminatory animus." *Id.*

We hold that Chapman failed to show the Office's reason for disciplining him was pretext for race discrimination or retaliation. We reach this conclusion after considering Chapman's three primary arguments.

9

Chapman first contends that the Office's reference to his overdue reports was pretextual, because other deputy chiefs who had overdue personal and regional reports were not disciplined in a similar manner. A plaintiff seeking to show that he was treated differently than other employees "must produce evidence that the plaintiff and comparator[s] dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haynes*, 922 F.3d at 223–24 (citation omitted). Here, Chapman has failed to show that he and the other deputy chiefs "engaged in the same conduct," because Chapman had far more overdue regional and personal reports than any other deputy chief. *See id.*

In February 2021, when Chief Der emailed each of the deputy chiefs a list of their overdue reports, Chapman had 50 overdue reports. The other two deputy chiefs who received emails had 1 and 16 overdue reports, respectively. Moreover, after the two other deputy chiefs received emails from Chief Der, they both resolved their late reports within two weeks. Chapman, by contrast, did not respond until Chief Der followed up. Likewise, in June 2021, at the time Chapman was transferred to headquarters, the Northeast region had 239 late reports. The region with the second highest number of late reports at that time had only 66. Given these disparities, the fact that Chapman was disciplined, while two white deputy chiefs were not, fails to indicate that the disciplinary actions against Chapman were motivated by race rather than concerns about his backlog of reports.

Chapman's second contention, that the Office was not concerned about his overdue reports until he began complaining about racial discrimination, lacks merit because this

contention misstates the record. The unrefuted evidence shows that Chief Der ordered Chapman to address his overdue reports, both personal and regional, numerous times and long before Chapman raised any complaint about racial discrimination in the Office.

Finally, Chapman argues that the history of race-based, discriminatory comments in the Office show that the disciplinary actions taken against him were motivated by racial animus. "Discriminatory comments by key decisionmakers can serve as circumstantial evidence of pretext under the *McDonnell Douglas* framework." *Wannamaker-Amos*, 126 F.4th at 259–60. However, "in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 300 (4th Cir. 2010). Relevant factors to consider in weighing such evidence include "the identity of the speaker, the nature and substance of the comments, and the temporal proximity of the comments to the challenged decision." *Wannamaker-Amos*, 126 F.4th at 259–60 (citation omitted).

Here, Chapman identifies three discriminatory comments that he alleges demonstrate pretext: 1) Deputy Chief Svites' request for a Black driver; 2) Deputy Chief McMahon's reference to "colored, lazy black females;" and 3) Fire Marshal Geraci's suggestion to include "black dogs" in the Office's Black History Month celebration. Although offensive and inappropriate, these comments are not sufficiently tied to the disciplinary actions taken against Chapman to permit us to infer pretext based on those remarks. The comments do not refer to Chapman's "qualifications, performance or character." *Wannamaker-Amos*, 126 F.4th at 259. Rather, the comments are "generalized comments about [Chapman's] protected class" and are therefore less probative of

11

"discriminatory animus." *Id.* at 259–60. Additionally, neither Svites nor McMahan were responsible for the decisions to transfer and suspend Chapman. *See id.* at 260 (noting that discriminatory comments are more significant when made by the "ultimate decisionmaker"). Although Geraci, as State Fire Marshal, could have influenced decisions regarding Chapman's employment, Geraci's comment was made over a year before any adverse action was taken against Chapman.

In sum, we hold that the record does not provide a basis for a jury to conclude that the reasons given by the Office for disciplining Chapman were pretextual. Chapman has not carried his burden to show that he was subjected to race discrimination or to retaliation for his protected activity. *Reeves*, 530 U.S. at 143.

## IV.

Accordingly, we affirm the district court's judgment in favor of the Office.[5]

*AFFIRMED*

---

[5] After reviewing the record and Chapman's briefs on appeal, we conclude that any additional arguments lack merit.